## FOREST OF DEAN IRON ORE CO. v. UNITED STATES.

### No. 46056.

Court of Claims.
May 6, 1946.

———◆———

Orison S. Marden, of New York City (White & Case, Charles J. Fay, Adria D. Stevenson, Benjamin P. De Witt, and Sidney Pepper, all of New York City, on the brief), for plaintiff and plaintiff-intervenor.

Percy M. Cox, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

This is a suit for the value of 61,948 cubic yards of crushed stone taken and used by the Secretary of War for the United States Military Academy.

In June 1939 and for many years prior thereto plaintiff owned a tract of about 300 acres of land in the vicinity of the Academy reservation.

For a number of years iron ore had been mined from a rock formation on the premises. Entrance to the mine was through a slanting shaft with a 20-degree slope which extended underground into the adjacent property of the Fort Montgomery Iron Corporation, intervenor, from which a part of the ore was taken. The latter company had operated the mine under lease for about twenty-five years, the last lease expiring in 1935. The mine has not been operated since 1931. The plaintiff and the Fort Montgomery Iron Corporation have filed a stipulation agreeing that any judgment may be entered for plaintiff alone, they having agreed on a division of the proceeds of any such judgment. Hence plaintiff will be treated as the owner of all the property involved.

Mining operations consisted of removing intermixed stone and iron ore. The combined rock and ore was run through a rock crusher and, prior to 1916, the iron and ore were separated by hand. After 1916 a magnetic separator was installed, the mixed rock and ore crushed to a size that would pass a 2-inch mesh, then placed on a moving belt under a series of magnets which separated the ore from the crushed rock.

The waste rock was placed in four piles. The piles contained crushed rock of mixed sizes varying from dust to pieces as large as two and three cubic feet.

A laboratory examination of these rock piles by the United States Army Corps showed four main types: coarse grained granite of various colors; fine grained hard traprock; gneiss containing feldspar, quartz and mica; and magnetite iron ore.

Because of its fractured condition and mixed content, the stone was not suited to first grade concrete or surface highway work. It was appropriate for random fill and for the base of highways. It was better for this purpose than the earth and gravel fill usually taken from borrow pits.

The evidence does not disclose whether there were any sales of stone from these piles prior to 1926, but between 1926 and 1935 stone was sold from the waste piles by the Fort Montgomery Iron Corporation totaling $7,361.24. Most of this stone was purchased by the adjacent town of Highlands for use on the road leading from the mine to Fort Montgomery and other sec-

ondary roads in the vicinity. The price prior to September 1928 was 25 cents a cubic yard; subsequently and through 1935 the price paid was 50 cents a cubic yard.

On June 14, 1939, the defendant filed a petition in the United States District Court for the condemnation and acquisition in fee simple of certain lands adjoining the reservation at West Point, including the 300 acres belonging to the plaintiff on which the mine shaft was located. The Fort Montgomery Iron Corporation was not made a party to the condemnation proceedings.

In the same proceeding the defendant on March 27, 1942, filed a declaration of taking and by judgment of the court entered on the same day title to the lands was vested in the United States and the Government took possession.

The West Point post quartermaster, Colonel Laubach, was informed of the facts by a memorandum from the land acquisition office, and he assumed that the title to the waste piles had passed to the defendant with the land and that they were included in the taking.

As post quartermaster Colonel Laubach was in charge of the construction work at the post and was authorized, among other duties, to construct some 20 rifle ranges. Beginning in the latter part of April 1942 and through the summer he ordered that stone from the waste piles be used as fill in the construction of these rifle ranges. The stone was also used for the widening and building of roads. Prior to October 1942 more than 50,000 cubic yards of this stone had been used by the defendant.

In October and November 1942 hearings were held in the District Court to determine the value of the land taken. At these hearings the Government urged that the stone piles on the land were personal property and the plaintiff in the present case urged before the District Court that the stone piles were realty and a part of the land. This is apparently the first time the issue had been directly raised.

The District Court did not render its decision until August 11, 1943. It held among other things that the stone was not realty and therefore was not to be considered as having been taken in that proceeding. The plaintiff appealed but at a later date dismissed the appeal.

After the hearings in the District Court but before a decision was rendered, the West Point post authorities on December 31, 1942, were advised by letter from Harry T. Dolan, the attorney of the Department of Justice representing the United States in the valuation hearings in the District Court, that the Government had taken the position in that case that the stone piles were personalty and had not been acquired by the taking of the land. On January 6, 1943, Colonel Laubach wrote plaintiff advising it that in the opinion of his office the waste material constituted personalty and that if plaintiff had deemed it of any value, it should have removed it from the premises when title passed to the United States. He also advised that if it considered the remaining part of the stone as having any value, it should be removed on or before February 5, 1943, and that if such action were not taken the plaintiff would be considered as having abandoned such personalty.

On January 13, 1943, the plaintiff's counsel replied by letter advising Colonel Laubach that since the defendant immediately after the declaration of taking had begun using the crushed stone and had used some 75 percent of it, the plaintiff concuded that the United States had taken title to the crushed stone and that the fair value thereof would be awarded in the condemnation proceedings; that evidence of the fair value of the crushed stone had been taken by the United States District Court and that while the issue had been tried and briefs submitted, the court had not yet rendered a decision; and that in these circumstances it would be highly improper for either the Government or the Forest of Dean Iron Ore Company to take any action while the matter was still pending and undecided by the court.

After this exchange of letters no more stone was removed from the waste piles until the summer of 1943 when defendant used 1,550 cubic yards to construct a filter bed for a sewage disposal plant, and in the summer of 1944, 450 additional cubic yards

were used by the defendant for the same purpose.

In explaining why he took the additional stone, Colonel Laubach said that he had given plaintiff 30 days in which to remove the remaining portion of the stone, and since it had not done so he assumed it had been abandoned. This seems rather strange in view of the fact that the 30 days was given in midwinter and according to Colonel Laubach's own testimony the winters were very severe and he was out only once or twice during the 30-day period. It was wartime with labor and transportation difficult to obtain. It seems especially illogical to assume ownership since his attention had been called to the fact that the matter had not yet been decided but was still pending before the United States District Court.

The total amount of crushed stone used by the defendant was approximately 61,948 cubic yards. We find the fair and reasonable value of the stone thus used by the defendant to be 15 cents a cubic yard.

The defendant admits that it took and used the stone. Its chief defense is that since the stone was not included in the taking of the land and that since Colonel Laubach had assumed that the stone belonged to the Government, there was no contract either express or implied in fact to pay for the stone, and that consequently the Court of Claims lacks jurisdiction to hear and determine this case and award the value of the stone to the plaintiff. It therefore rests its defense on the mental processes of the Colonel.

Colonel Laubach's testimony is not altogether consistent or satisfactory. Undoubtedly he assumed that the Government had acquired title to the stone in the condemnation proceedings and he necessarily assumed, if he thought about it at all, that the value of the stone would be included in the award that would be made to the plaintiff; yet in his letter of January 6, 1943, he said that in the opinion of "this office" referring to his own organization, the waste material constituted personalty. He undoubtedly had authority to procure the necessary ingredients for constructing the rifle ranges, but in view of the conflicting statements in his testimony and in his letter it is not quite certain what he did think. In the words of the private soldier

"The stupid ox that stands and blinks
Is wiser than the goof who thinks
He knows the colonel's mind."

The plaintiff of course claims that there was a contract implied in fact by virtue of the taking and using of the stone which was the property of the plaintiff and intervenor and that this court has jurisdiction to render judgment.

The defendant cites a number of cases, most of which are either clearly tort cases or those in which the defendant had some outstanding claim of title and therefore justified the taking on the basis that the Government already owned the property. These are clearly distinguishable from the case at bar. In this case the defendant had no claim whatever to any part of the property. Its only claim of a right to use was connected with the process of taking the property. The property was taken and used. Then after the taking the defendant raised the question that the stone was not included in the condemnation proceedings. There was no claim of title or color of title to this property on the part of the Government other than any claim that might arise in connection with the condemnation proceedings.

Actions speak louder than words. To contend that one branch of the Government can take property and after its use for the benefit of the Government, another branch of the Government can assert that the property was not included in the proceeding on which the taking was based and thus refuse to pay for the property on the ground that someone had a mistaken notion as to what the Government's rights were, is to strain at a technicality.

The Government's position is somewhat similar to that of the boy who entering a restaurant ordered a piece of apple pie. After it was placed on the counter before him he, boylike, changed his mind and told the proprietor he would like to trade the pie for a piece of cheese. Upon eating the cheese and starting to leave the proprietor asked him to pay for the cheese. The boy said "I traded you the pie for the cheese." The proprietor replied "but you didn't pay

me for the pie" and the boy responded "but I didn't get the pie." Through these years that boy's logic has troubled me. I am equally troubled by the position of the defendant in this case.

It is worthy of note that a considerable portion of the rock taken by the defendant was the property of the Fort Montgomery Iron Corporation, or at least was claimed by that company, and that such company was not made a party to the condemnation proceedings. Thus whatever merit the position of the defendant might have it offers no defense for the taking of that part of the property which belonged to the Fort Montgomery Iron Corporation. It may be added also that it could not be made to cover the stone that was more or less arbitrarily taken after the defendant's contention was disclosed by the hearings and Colonel Laubach and the other officials had full knowledge that the Government had no legal claim to the stone.

In Tempel v. United States, 248 U.S. 121, 131, 39 S.Ct. 56, 59, 63 L.Ed. 162, the Supreme Court draws a clear distinction between cases in which the Government takes property under outstanding claim of title, and those in which the Government has no color of title apart from the right of eminent domain. In commenting on the latter type of cases the court uses the following language:

"Under such circumstances it must be assumed that the government intended to take and to make compensation for any property taken, so as to afford the basis for an implied promise. And when the implied promise to pay has once arisen, a later denial by the government (whether at the time of suit or otherwise) of its liability to make compensation does not destroy the right in contract and convert the act into a tort."

In United States v. Georgia Marble Co., 5 Cir., 1939, 106 F.2d 955, 957, the court uses the following language:

"It is clear in this case that the government recognized that it had no right to take over property not belonging to the general contractor. The trial court properly held that the government intended to take the marble, devote it to a public use, and pay for it. There was an implied contract to pay and the court had jurisdiction under the Tucker Act. United States v. Buffalo Pitts Co., 234 U. S. 228, 34 S.Ct. 840, 58 L.Ed. 1290. The implied promise to pay having arisen, the government cannot by a later claim destroy the plaintiff's right in contract and convert its act into a tort for which the statute affords no remedy. See Tempel v. United States, 248 U.S. 121, 131, 39 S.Ct. 56, 63 L.Ed. 162."

The defendant in the main relies on cases in which the Government had an outstanding continuing claim of title independent of any condemnation proceedings. No such situation was involved here.

The very act of taking and appropriating carried with it the implied promise to pay the reasonable value. Lucy W. Belcher, Ex'x. v. United States, 94 Ct.Cl. 137. In addition the defendant's conduct in accepting and retaining the benefits of the use of plaintiff's property constituted a ratification giving rise to an implied promise to pay. United States v. North American T. & T. Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935.

The plaintiff is entitled to recover the sum of $9,292.20 together with interest thereon at the rate of four percent per annum, not as interest but as a part of just compensation, on the following sums from the dates indicated below:

On $8,992.20 from July 1, 1942
On     232.50 from July 1, 1943
On       67.50 from July 1, 1944

The intervening petition of the Fort Montgomery Iron Corporation will be dismissed. It is so ordered.

WHALEY, Chief Justice, and WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.