**Dominic EYHERABIDE, Jean M. Eyherabide, Raymond Castanchoa and Marie Castanchoa**

v.

**The UNITED STATES.**

**No. 95–60.**

United States Court of Claims.

May 14, 1965

Stephen Eyherabide, Bakersfield, Cal., for plaintiffs. Mack, Bianco, King & Eyherabide, Bakersfield, Cal., of counsel.

Kenneth H. Masters, Washington, D. C., with whom was Acting Asst. Atty. Gen., J. Edward Williams, for defendant.

Before LARAMORE, Acting Chief Judge, DURFEE, DAVIS and COLLINS, Judges, and WHITAKER, Senior Judge.

DAVIS, Judge.

The owners of a small tract adjacent to, and surrounded on three sides by, the Navy's Mojave Gunnery Range "B" sue for just compensation for the temporary

taking of their property from 1954 through 1959.[1] There were no formal proceedings to seize or acquire rights in this land, and defendant denies that it intended to exercise the power of eminent domain, but plaintiffs urge that nevertheless the defendant's interference with their property was so great that it necessarily amounted to a taking.

Federal law recognizes that, although there may be no official intention to acquire any property interest, certain governmental actions entail such an actual invasion of private property rights that a constitutional taking must be implied. See, e. g., Goldblatt v. Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); Armstrong v. United States, 364 U.S. 40, 48–49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed. 2d 1228 (1958); United States v. Kansas City Life Ins. Co., 339 U.S. 799, 809–810, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); United States v. Dickinson, 331 U.S. 745, 748, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945); Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922); Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922); Block v. Hirsh, 256 U.S. 135, 155–156, 41 S.Ct. 458, 65 L.Ed. 865 (1921). The interference with use or possession may be so substantial and of such a character that it cannot be done without compensation under the Federal Government's regulatory and executive powers. Where these factors exist and a constitutional taking is implied, it is assumed that the United States has acquired a definite interest in the property, permanent or temporary, such as fee title an easement, a servitude, or a leasehold.

In this case we have a series of occurrences which culminated in the near-total deprivation of the owners' use of their property for the period of almost six years for which they ask compensation. As in the flooding, avigation-easement, and projectile-easement cases, we think that the combined acts of invasion and interference, if properly attributable to the defendant, were so great that a taking must be implied.

The Navy's Mojave Gunnery Range "B" is an enormous and desolate area of about 700 square miles in the Mojave desert of California, used for testing naval aerial ordnance of various kinds. Plaintiffs' small ranch of 80 acres forms an indentation in the southern boundary of the gunnery range which surrounds it on the east, west, and north. This ranch is the only improved property for miles around. During and after World War II, from mid-1943 to mid-1947, the tract was leased by the former owners to the Navy and utilized as an integral part of the gunnery range. Since July 1, 1947, the Government has had no claim on the property—except as it may have involuntarily acquired a temporary interest by the events to be described. The Eyherabides (one-half of the plaintiffs) purchased the ranch in May 1952, together with another couple who sold their share to the Eyherabides in September 1956; the Castanchoas (the other plaintiffs) acquired their one-half interest later, in December 1956.

When the ranch was bought in 1952 it had several improvements: two small but complete houses, a barn, a tank house with shower room and tank, a garage, sheds, corrals, windmill and tower, a pump, pipelines, and trees. At that time these improvements had not been damaged by shells, rockets, explosives or other instrumentalities of naval ordnance. The new owners installed livestock scales. Their purpose was to use the property, which had one of the few sources of water in the region, as a head-

---

1. This is the only period for which plaintiffs claim a taking. The petition was filed on March 17, 1960, and the six-year period which is open under the statute of limitations, 28 U.S.C. § 2501, began on March 17, 1954.

quarters for their sheep-herding and grazing activities covering a very wide area in the general vicinity. To that end, caretakers were installed on the property to guard against vandals and maintain the facilities.

Shortly after the Eyherabides and their then co-owners acquired the land in 1952, they became aware of a series of interferences—most of them clearly attributable to defendant but others which cannot be directly tied to any source. In August 1953, four of the pack burros on the ranch were found shot to death, but it is not known by whom. Early in 1954, a naval security guard employed by the gunnery range visited the ranch, at least three times, and warned the caretakers that they were trespassers, the land belonged to the Government and formed part of the bombing range, bombs and rockets were used on the property which was in a danger zone, and the caretakers should move on pain of arrest. The defendant maintained all around the gunnery range—including spots on all the roads leading to the ranch and on posts very close to the ranch buildings [2]— warning signs stating: "DANGER AREA, KEEP OUT, Aerial Gunnery Range, U. S. Naval Property." These were apparently a relic of the World War II days when the ranch was a part of the range, but the signs were left standing in such positions that persons approaching the ranch would reasonably consider the warnings to continue to refer to plaintiffs' property as well as the range proper. That would be the normal inference.

In the spring of 1954, an airplane dropped two fuel tanks about an eighth of a mile from the ranch house; in the early fall of 1954 another plane dropped two unidentified "silver" objects very close to plaintiffs' south fenceline. These

droppings may well have been outside the ranch property, but they were sufficiently near that as a result the caretakers, thinking also of the guard's prior warnings, moved off the property in October 1954. After that, the owners were unable to obtain any caretakers, although they made numerous attempts and even took seven or eight prospective occupants out there. The Government's warning signs frightened them all.

From time to time after 1952, the owners found shell casings in the barn, and 20-mm. casings, tow targets, rockets, and gas tanks at other places on the property. They also discovered large shell holes in the barn, the garage, and the main house. None of these objects, or this damage, existed before the ranch was acquired in 1952; it is also probable that most (if not all) of the objects came onto the land after the caretakers left in the fall of 1954; the holes in the structures were definitely made thereafter.[3] The owners likewise found similar objects as far as 10 to 15 miles south of the ranch and of the southern boundary of the range. Shortly before the trial of this case (April-May 1962), naval airplanes were landing just south of the ranch (and therefore outside of the range).

The structures on the land (except, perhaps, for the tanks and some of the corrals) were destroyed between 1957 and 1959, apparently by dynamite (or other explosives) and burning. We do not know who is directly responsible for this damage. There were vandals in the area, but it is also possible that naval personnel blew up the improvements in connection with some of their ordnance activities.[4] With commendable candor, defendant's counsel informed us, at the oral argument, that in December 1962 naval officers, thinking that the ranch formed part

2. None of the signs was actually placed on the plaintiffs' land.

3. The testimony on this point is not precise as to time, but we think the conclusions we has drawn as to chronology are a fair inference from the evidence as a whole—testimonial, documentary and

photographic—as well as from the Trial Commissioner's findings.

4. There is evidence, on the part of the defendant, that this destruction did not result from aerial bombardment, but it may be that land explosives were used for some naval purpose or project.

of the range, selected the tanks as a target for rocket practice, and the tanks were destroyed at that time.[5] This last incident is outside the period for which plaintiffs sue, but it highlights the significance of the events which did occur within the critical timespan.

It is indisputable, as this recital shows, that the owners of the ranch were unable to use it for any but minimal functions [6] from the early part of 1954 through 1959, and that the property must have diminished in value during that period through the damage and destruction of the improvements (as well as the inability to use it as a ranch and sheep-herding headquarters). This was not a marginal harm, but a nearly total deprivation of the benefit of the tract. If the defendant was responsible for the acts causing this loss, the injury to the owners was so great that a taking can properly be implied. There were repeated physical invasions of various types on the land itself —the guard's directions to the caretakers to leave; droppings of fuel tanks and tow targets; entry of shells and rockets; damage and destruction of the buildings and improvements. Isolated invasions, such as one or two floodings or sprayings, do not make a taking (see North Counties Hydro-Electric Co. v. United States, 151 F.Supp. 322, 323, 138 Ct.Cl. 380, 382–383 cert. denied, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957); B Amusement Co. v. United States, 180 F.Supp. 386, 389, 148 Ct.Cl. 337, 341–342 (1960); Harris v. United States, 205 F. 2d 765, 767–768 (C.A.10, 1953)), but repeated invasions of the same type have often been held to result in an involuntary servitude. See Portsmouth Co. v. United States, supra, 260 U.S. at 329– 330, 43 S.Ct. 135; United States v. Spon- enbarger, 308 U.S. 256, 267, 60 S.Ct. 225, 84 L.Ed. 230 (1939); United States v.

Causby, supra, 328 U.S. at 266–267, 66 S.Ct. 1062; Harris v. United States, supra. We see no reason why combined and cumulative invasions of different types, as in this case, should not have the same effect. They, too, show that the defendant has in fact appropriated the use of the land for itself.

In addition, there were the warning signs ringing the ranch, the aircraft flying in the area and landing nearby, and the objects found in the neighborhood of the ranch but outside its boundaries (and that of the gunnery range). By themselves, these might not amount to a taking because they did not intrude directly upon the plaintiffs' property,[7] but they do add to the showing that, whatever the higher officials may have thought, local naval personnel continued to regard the ranch (and the adjacent area) as a useable part of the "greater range", to be treated just like the legal range itself. That seems to be the fact, either because the Navy never succeeded in informing the range personnel that the lease of World War II days was over or because the men in the field were habitually careless of limits and boundaries. There is evidence that the Navy continued to supply outdated maps but, whatever the cause, the result was a failure to confine the Navy's activities within the gunnery range. In appraising this conduct, we can properly take account of the acts done outside of the borders of plaintiffs' land but which affected its use, along with the actual invasions. Once there is a significant intrusion onto property, the character and magnitude of the appropriation must be evaluated on the basis of all the related circumstances, not merely the acts of invasion alone. Cf. Mock et al. v. United States, Ct.Cl., Nos. 31–59, 349– 359, decided Feb. 14, 1964, slip op., pp. 2– 3. We are justified, in other words, in

---

5. The tanks had previously been damaged but not destroyed.

6. They did use it, sporadically, for water for their sheep and for grazing on a few occasions.

7. It may be, however, that it would constitute a taking to surround private prop- erty with warning signs, such as those used here, which cry "Keep Out" and effectively deter people from coming onto the private land. Presumably it would be a taking to fence off all ground access to a tract served by public roads. We need not decide whether such warning signs, by themselves, would be enough.

finding a cumulative combination of acts, from 1954 to 1959, which effectively excluded plaintiffs from using their land and which ended in the destruction of their property.

■ To what extent is the defendant responsible for this loss? All the incidents from 1954 to 1959 are directly attributable to naval personnel except, perhaps, for the dynamiting and burning of the improvements in 1957 and thereafter. That may have been due to vandalism, in whole or in part, but the vandalism occurred because the plaintiffs could not maintain caretakers on the place. Defendant's activities on and near the ranch, defendant's signs, and defendant's treatment of the plaintiffs' tract as part of the range were the direct cause of this inability to obtain occupants. We think that, in these circumstances, the Government must be held responsible for the foreseeable consequences to the buildings and other improvements. That loss was not "consequential damage", as the term is used in the law of eminent domain, but a direct physical invasion assignable to, because the natural product of, the dominion exercised over the tract by Navy servicemen and employees. If the Government's encroachments on private property make it possible for another to get the benefits of that property, the United States is liable just as if it used the property for itself. Ivey v. United States, 88 F.Supp. 6, 8 (E.D.Tenn., 1950). "The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking." United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). Cf. Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195, 30 S. Ct. 459, 54 L.Ed. 725 (1910); Kimball Laundry Co. v. United States, 338 U.S. 1, 13–14, 69 S.Ct. 14, 34, 93 L.Ed.2d 1765 (1949).

■ Nor is this a case in which we can say that the implication of a taking is negated because the actions of the defendant's representatives were wholly unauthorized. Cf. United States v. North American Transp. & Trading Co., 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920). The guard who cautioned the caretakers acted within the general scope of his duties, as did the naval personnel who lobbed shells, dropped casings and other objects, and flew over and near the property; the placement of the warning signs was also obviously within the local authority of the gunnery range. No statute or regulation forbade these activities.[8] They cannot be characterized as unauthorized merely because they may have been mistaken, imprudent, or wrongful. Cf. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689–692, 693–695, 703, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Forest of Dean Iron Ore Co. v. United States, 65 F.Supp. 585, 106 Ct.Cl. 250 (1946); Ivey v. United States, supra, 88 F.Supp. at 8–9; Silberman v. United States, 71 F.Supp. 895 (D. Mass., 1947).

■ The measure of plaintiffs' recovery is for the temporary taking (from 1954 through 1959). This standard, differing somewhat from that applicable where a full interest is acquired, allows not only compensation for the use and occupancy of the property but also for the loss of improvements and the cost of placing the property in its pre-taking condition (if it has diminished in value). Cf. United States v. General Motors Corp., supra, 323 U.S. at 381–384, 65 S.Ct. 357; Kimball Laundry Co. v. United States, supra, 338 U.S. at 7, 14–16, 69 S.Ct. 1434; United States v. Westinghouse Elec. & Mfg. Co., 339 U.S. 261, 264–265, 267–268, 70 S.Ct. 644, 94 L.Ed. 816 (1950); United States v. Pewee Coal Co., 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951).

■ The parties have presented different views of the measure of these components of loss. On the whole the Trial Commissioner has tended toward the position of plaintiffs' witnesses, and

---

8. The 11th Naval District, which had jurisdiction over the gunnery range, was authorized to acquire leasehold interests.

we see no reason to overturn his findings. Defendant does not now contest the amount found to reimburse plaintiffs for the loss of the use of their tract from March 19, 1954 through 1959 ($2,070). The sum of $1,000 for clearing and restoring the property in condition for rebuilding is also a reasonable allowance under the criteria used for a temporary taking. There is a challenge to the sums found for the reasonable value of the destroyed improvements and personal property (totaling $20,050), but these figures are well supported by plaintiffs' evidence and the contrary testimony of defendant's expert is not persuasive; among other things, he did not base his valuations on the correct dimensions and character of the improvements as of 1957. Defendant complains that the owners presented no direct evidence as to the diminution in market value of the tract as a result of the loss of the improvements, but, as we have pointed out, in temporary takings the damage need not be calculated on that basis where the improvements are lost or damaged. The components of injury can be separately evaluated. See Kimball Laundry Co. v. United States, supra, 338 U.S. at 7–8, 69 S.Ct. 1434; United States v. General Motors Corp., supra, 323 U.S. at 383–384, 65 S.Ct. 357; Wah Chang Corp. v. United States, 282 F.2d 728, 736, 151 Ct.Cl. 41, 53–54 (1960).

Since the Castanchoas, co-plaintiffs, acquired their interest in the tract on December 24, 1956—about 33 months after March 19, 1954—they cannot recover for any part of the claim accruing prior to that time. 31 U.S.C. § 203; United States v. Shannon, 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321 (1952); United States v. Dow, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). The amount assignable to their share of the 33 months "rent" prior to December 24, 1956 is $495; this will be deducted from the total "rent" of $2,070 which we find to be owing. The improvements (and other property) were finally destroyed in 1957, after the Castanchoas became co-owners, and they can properly share in that award.

Plaintiffs are entitled to recover the sum of twenty-two thousand six hundred and twenty-five dollars ($22,625). They are also entitled to an additional sum computed at 4 per cent per annum, to compensate for delay in payment, as part of just compensation.[9] Judgment is entered to that effect.

WHITAKER, Senior Judge (dissenting in part):

The evidence in this case does not convince me that it was the defendant who destroyed the structures on plaintiffs' ranch. Finding 16 says they were destroyed "as a direct result of the acts of the defendant *and* of vandalism by unknown individuals." In my judgment this finding should have read, "as the direct result of the acts of the defendant *or* of vandalism by unknown individuals." My authority for this is the majority opinion itself.

It states:

"The structures on the land (except, perhaps, for the tanks and some of the corrals) were destroyed between 1957 and 1959, apparently by dynamite (or other explosives) and burning. We do not know who is directly responsible for this damage. There were vandals in the area, but it is also possible that naval personnel blew up the improvements in connection with some of their ordnance activities.[4]"

The footnote four (4) therein referred to reads:

"There is evidence, on the part of the defendant, that this destruction

---

9. This additional sum (commonly called interest) will run from January 1, 1960 (the end of the period of taking) to date of payment, on $21,050; on the $1,575 "rental allowance" ($2,070 less $495) the additional sum will run, for convenience sake, from the mid-point of the period of taking, i. e., February 1, 1957. Cf. Kimball Laundry Co. v. United States, supra, 338 U.S. at 4, 69 S.Ct. 1434.

did not result from aerial bombardment, but it may be that land explosives were used for some naval purpose or project." [1]

Notwithstanding the indefiniteness of the proof as to who was responsible for the destruction of the structures, the majority apparently holds the defendant responsible therefor because its agent, the guard, had told the owners' caretaker that he was a trespasser, that the land upon which he was residing was a part of the gunnery range, and that, if he did not get off, he would be arrested, and that thereafter the owners could find no one else who was willing to come and live there.

For this reason, apparently, the finding above quoted further says: "The vandalism was the natural result and product of defendant's acts." I cannot see how this conclusion can be drawn. After the owners had been apprised of the guard's visit to their caretaker, they complained to the 11th Naval District and were informed by it that the personnel on the gunnery range "were not correctly informed as to the limits" of the range, but that they had been instructed "to avoid further annoyance to your clients or interference with their operations on this property." (Finding 10.)

By this time it was true the former caretakers of the property had left, but I do not think the defendant was responsible for the owners' inability to find other caretakers who were willing to reside on the property. They stated that when they took several prospective caretakers out to the property, the prospects were scared away by warning signs on the roads leading to the property reading: "DANGER AREA, KEEP OUT, Aerial Gunnery Range, U. S. Naval Property." The opinion very frankly says that these signs must have been placed there when the Government had a lease on the plaintiffs' property and had not removed them but, independent of this, whenever the prospective caretakers saw those signs, the owners, of course, told them that they did not apply to their property but only to the land north of it, which was the area of the gunnery range.

It is no doubt true that people were not particularly anxious to live so close to a gunnery range, but it is also true, no doubt, that they were not anxious to live in this area in the midst of a desert so far removed from civilization or any other habitation.

The fact that the owners could not get another caretaker to reside on their property, for which defendant was not responsible, certainly does not make it responsible for any vandalism that may have been committed.

In short, I simply do not believe that the plaintiffs have carried the burden on them of showing that it was the defendant who was responsible for the destruction of these structures.

However, I think that, while evidence of the imposition of a servitude on the land by the defendant is weak, the shell holes in the barn and the garage and the main house are persuasive that the defendant probably did use it to some extent as a part of the gunnery range itself. I am not particularly happy about holding the defendant liable for imposing a servitude on the land, but what I have mentioned, together with the other reasons relied upon by the majority, inclines me to go along with the majority on this feature of the case.

1. True, the opinion had previously stated that large shell holes were discovered in the barn, the garage, and the main house; but, while this was a damage to these pieces of property, it was not a destruction of them, and therefore, it was not a taking of them compensable under the Fifth Amendment.