**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Apr 10 2014, 9:17 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**MICHAEL C. HARRIS**
**JULIE A. PAULSON**
Harris Welsh & Lukmann
Chesterton, Indiana

ATTORNEYS FOR APPELLEE:

**NICHOLAS T. OTIS**
**MARTIN W. KUS**
Newby Lewis Kaminski & Jones, LLP
LaPorte, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RICHARD BROWN and JANET BROWN, | ) | |
| | ) | |
| Appellants-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 64A03-1308-PL-332 |
| | ) | |
| CITY OF VALPARAISO, INDIANA, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable Roger V. Bradford, Judge
Cause No. 64D01-0911-PL-11902

**April 10, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Richard and Janet Brown filed a three-count complaint against the City of Valparaiso ("the City") seeking damages for flooding of their property and home, contending that the flooding was caused by the City. In their complaint, the Browns claimed inverse condemnation, a 42 U.S.C. § 1983 civil action for deprivation of rights, and negligence.[1] The trial court initially denied the City's motion for summary judgment as to the Browns' inverse condemnation and negligence claims, but entered judgment in favor of the City on the §1983 claim. After holding an evidentiary hearing, the trial court entered an order denying the Browns' inverse condemnation claim on the merits. The Browns now appeal, contending that the trial court erred in rejecting their claim of inverse condemnation arising from flooding due to a rain storm.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Sometime around 1973, Clarence Brown, Richard Brown's grandfather, parceled out of his farmland what is now the Browns' property, with Clarence retaining ownership of nearly 120 adjoining acres of farmland. The Browns live on the east side of Silhavy Road in Valparaiso, Indiana, and their property borders what is known as the Hotter Detention Facility, a water retention/detention facility run by the City. The Browns built an approximately 2000-square-foot, brick, ranch-style home with a 900-square-foot attached garage in the 1970s. In the late 1970s or early 1980s, the Browns finished the lower level of their home, completing an additional 2000 square feet of living area, with

---

[1] We previously considered the City's interlocutory appeal from the trial court's order denying the City's motion for summary judgment on the Browns' negligence claim. *See City of Valparaiso v. Brown*, No. 64A03-1307-PL-239 (Ind. Ct. App. March 13, 2014).

the lower level walking out onto a 20' by 40' concrete patio. Except for certain parts, the farmland would eventually become the site of the Hotter Detention Facility, which lies immediately to the east of the Browns' property.

Also in the 1970s, the City developed a project in conjunction with a county drain. Storm drainage from one ditch, a city drain, would be connected with another ditch, which connected with and drained into the Kankakee River. A part of the plan was to improve an approximately ten-mile stretch of ditches, by widening, improving, and developing them through the course of the project.

Nearly contemporaneously with the drainage project, the City began developing a traffic-control project at the five-point intersection of Calumet Avenue, Roosevelt Avenue, and Vale Park Road. During the course of the project, storm water problems developed and the City received money from the federal government. As a result of the storm water concerns, the City acquired the Hotter Lagoon property and developed it by installing a levee to retain the storm water. The City received approval from the Indiana Department of Natural Resources on March 24, 1977. Under the plan, water would be brought into the Hotter Lagoon at an elevation of 790.8 feet above sea level and would flow in a southeasterly direction into a ditch with a control structure of three, 24-inch corrugated metal pipes with an invert of 788.4 feet and a crest of 791 feet above sea level. The project was completed in the 1970s.

In the early 1980s, the City experienced three major storms within a period of years. The City commissioned an engineering study to plan and develop a city-wide storm water plan because of the flooding and storm water problems experienced by the City. The City

3

hired Donahue and Associates, design engineers and consultants, to assist the City Engineer, John Hardwick, in the design of the water-detention facility. Donahue was to study the storm water problems and to design and develop a larger storm water facility at the location of the current Hotter Detention Facility, and to provide advice to the City by identifying problem areas, providing solutions to the problems, and providing cost estimates of the proposed improvements. In adopting the completed plan recommended by Donahue, the City, by its engineering and mayor's offices, weighed competing priorities and budgetary considerations. The Hotter Lagoon was expanded for the construction of the Hotter Detention Facility.

The Hotter Detention Facility was designed and developed to withstand a one-hundred-year storm[2] based on the City's previous experience with severe storms and the balancing of costs to develop and maintain a facility capable of handling larger storms. At the time the Hotter Detention Facility was being developed, what is now known as the Indiana Department of Transportation was planning and engineering the Indiana State Highway 49 Bypass. The Department of Transportation was in need of dirt and soil to build bridge embankments on Highway 49 and the City needed to remove dirt and soil in the development of the Hotter Lagoon project.

The City and the Department of Transportation entered into an agreement under which the City would prepare plans and preliminary special provisions for a storm detention pond, outlet structures, and emergency spillway. The City was to acquire all

---

[2] In any given year, a one-hundred year storm has a one-percent chance of occurring.

4

rights-of-way needed for construction of the Hotter Detention Facility. The cost to prepare the plans and acquire the rights-of-way was the City's obligation. The cost of the construction was to be the State's obligation with the City's consent. As consideration for construction of the Hotter Detention Facility, the State and its contractors were allowed to remove, at no charge, any and all material excavated during the construction to use on the Highway 49 Bypass Project. The City was to provide all maintenance to the Hotter Detention Facility after its construction.

Hardwick had information in his office indicating that a topographical survey prepared on May 27, 1977, showed the 100 Year Flood Stage at an elevation of 792.12 feet above sea level. The engineering drawing additionally showed the elevation at the border shared by the Browns' and the City's Property was at an elevation of 792.5 feet above sea level, and that portions of the Browns' backyard were at an elevation of 792.8 feet above sea level. The Browns' property, although higher than the 100 Year Flood standard, was more than three feet lower than the wall of the Hotter Detention Facility and more than two feet lower than the Hotter Detention Facility's spillway.

Over the weekend beginning September 13, 2008, Valparaiso, Indiana experienced significant rain storms, which led to flooding of some property, and which qualified the City of Valparaiso for federal disaster relief as a result of the storms and flooding. Tim Burkman, the City's engineering director, testified that the second of those storms, which occurred on September 11, 2008 through September 15, 2008, was in excess of the City's storm water capacity. Other detention facilities in Valparaiso exceeded their capacity and spilled over into streets and property. The storm produced 9.8 to 11 inches of rain.

5

According to Burkman, the U.S. Geological Survey reported that the storm was in excess of a 200-year storm based on 9.8 inches of rain. Some areas near the Hotter Detention Facility showed rain in excess of ten inches, which would be considered a 500-year storm event. David McCormick, an expert testifying on behalf of the Browns, acknowledged that based upon the amount of rain that fell, the storm was considered to be between a 200-year and 500-year storm. Burkman testified that the Hotter Detention Facility was designed for a 100-year storm and performed as it should, but could not handle the water exceeding its capacity.

Water entered the northeast portion of the Browns' property where it adjoined the Hotter Detention Facility. Sandbagging efforts by the Browns proved unsuccessful and approximately eighteen or more inches of water entered the lower level of their home, damaging the carpeting, drywall, furniture, electrical outlets, appliances, and the furnace. The Browns' property was the only privately-owned property that received water from the Hotter Detention Facility, as there were no reports of flooding of any properties on the perimeter of or adjoining the Hotter Detention Facility save for the Browns' property.

After unsuccessfully attempting to obtain relief from the City, the Browns complied with all tort-claim notice requirements and ultimately filed their complaint against the City to recover for their losses. Additional facts will be supplied as necessary.

**DISCUSSION AND DECISION**

This appeal requests review of the trial court's denial of the Browns' inverse condemnation claim on the merits. Because the Browns did not prevail at trial, they appeal from a negative judgment. A judgment entered against a party who bore the burden of

6

proof at trial is a negative judgment. *Garling v. Ind. Dep't of Natural Res.*, 766 N.E.2d 409, 411 (Ind. Ct. App. 2002). On appeal, we will not reverse a negative judgment unless it is contrary to law. *Mominee v. King*, 629 N.E.2d 1280, 1282 (Ind. Ct. App. 1994). To determine whether a judgment is contrary to law, we consider the evidence in the light most favorable to the appellee, together with all the reasonable inferences to be drawn therefrom. *J.W. v. Hendricks Cnty. Office of Family & Children*, 697 N.E.2d 480, 482 (Ind. Ct. App. 1998). A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different than that reached by the trial court. *Mominee*, 629 N.E.2d at 1282.

Additionally, Indiana Trial Rule 52(A) provides that on appeal from claims tried to the bench, this court "shall not set aside the findings or judgment unless clearly erroneous . . . ." First, we determine whether the evidence supports the findings and then whether the findings support the judgment. *Megyese v. Woods*, 808 N.E.2d 1208, 1213 (Ind. Ct. App. 2004). "In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence to support the findings or the findings fail to support the judgment." *Id.* (citation omitted). We will not reweigh the evidence or the credibility of the witnesses. *Id.* Rather, we consider only the evidence most favorable to the trial court's judgment, with all reasonable inferences drawn in favor of the judgment. *Id.*

With respect to inverse condemnation claims, our Supreme Court has stated the following:

> The state has inherent authority to take private property for public use. *Kelo v. City of New London*, 545 U.S. 469, 477, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005). The Indiana Constitution and the Fifth Amendment require just

7

compensation if this authority is exercised. *Schnull v. Indianapolis Union Ry. Co.*, 190 Ind. 572, 575, 131 N.E. 51, 52 (1921). Indiana Code Chapter 32-24-1 (2004) outlines the process by which the state is to initiate eminent domain proceedings. If the government takes property but fails to initiate proceedings, Section 32-24-1-16 explicitly allows an owner of property acquired for public use to bring a suit for inverse condemnation to recover money damages:

> A person having an interest in property that has been or may be acquired for a public use without the procedures of this article or any prior law followed is entitled to have the person's damages assessed under this article substantially in the manner provided in this article.

An action for inverse condemnation requires: "(1) a taking or damaging; (2) of private property; (3) for public use; (4) without just compensation being paid; and (5) by a governmental entity that has not instituted formal proceedings." 29A C.J.S. Eminent Domain § 560 (2007).

*Murray v. City of Lawrenceburg*, 925 N.E.2d 728, 731 (Ind. 2010).

The trial court's order contained the following findings:[3]

The Hotter Water Detention Facility was completed in 1987 and it was built to the required standard of withstanding a one hundred year rain. Plaintiffs' property flooded one time in September of 2008 when the City of Valparaiso received a two hundred to five hundred year rain storm. Plaintiffs' witness, David McCormick, speculated that the Plaintiffs' property would flood with a ten year rain. That has not been the experience. The Hotter Detention Facility was completed twenty-five years ago. The property has flooded one time, that being when the City of Valparaiso received a two hundred to five hundred year storm, a storm the size of which the facility was never intended to handle.

*Appellants' App*. at 9-10.

The evidence in the record supports the trial court's findings of fact. Hardwick testified that the Hotter Detention Facility was built and developed for a 100-year storm.

---

[3] The trial court's order is labeled "Order on 'taking' issue". The findings of fact and conclusions of law although included in the order, are not set forth with those particular labels. However, "[w]e are not bound by a trial court's characterization of its results as 'findings of fact' or 'conclusions of law.' Rather we look past these labels to the substance of the judgment . . . ." *AmRhein v. Eden*, 779 N.E.2d 1197, 1206 (Ind. Ct. App. 2002).

Burkman and Hardwick testified that the industry standard for water detention facilities such as the one at issue here is a 100-year storm capacity. Burkman further testified that the September 2008 storm, which was brought about by conditions related to Hurricane Gustav, was between a 200-year and 500-year storm. McCormick, the Browns' expert, admitted that the storm was in excess of a 200-year storm. Richard Brown testified that the only instance of flooding on his property from the Hotter Detention Facility occurred in September 2008, and that no water had entered his property prior to or after the storm event. The Browns' have failed to establish that the trial court's findings of fact are clearly erroneous.

Next, we look to the trial court's legal conclusions, which were set forth as follows:

> While neither Indiana nor federal law require permanent flooding for a taking to have occurred, they both require more than one instance of flooding or inevitably recurring flooding. One flooding in twenty-five years does not rise to that level.

*Appellants' App.* at 10.

To establish a taking, the Browns were required to prove as follows:

> Some physical part of the real estate must be taken from the owner or lessor, or some substantial right attached to the use of the real estate taken before any basis for compensable damage may be obtained by an owner of real estate in an eminent domain proceeding. It must be special and peculiar to the real estate and not some general inconvenience suffered alike by the public.

*Beck v. City of Evansville*, 842 N.E.2d 856, 863 (Ind. Ct. App. 2006) (quoting *Taylor-Chalmers, Inc. v. Bd. of Comm'rs*, 474 N.E.2d 531, 532 (Ind. Ct. App. 2006)). Further in *Mendenhall v. City of Indianapolis*, 717 N.E.2d 1218, 1227-28 (Ind. Ct. App. 1999), we stated as follows:

9

There are two stages to an action for inverse condemnation: 1) the landowner must show that he has an interest in land which has been taken for public use without having been appropriated under eminent domain laws; and 2) if the court finds that a taking has occurred, then the court appoints appraisers and damages are assessed. A taking by inverse condemnation includes 'any substantial interference with private property which destroys or impairs one's free use, enjoyment, or interest in the property.' . . . . An action for inverse condemnation is premature until such time as the landowner can establish that his property has been deprived of all economically beneficial or productive use.

[Internal citations omitted].

In *Beck*, homeowners sought damages on a claim of inverse condemnation after the City of Evansville suffered two major storm events, one in the summer of 2003, and the second in the summer of 2004. Surface water and sewage flowed on the property and into the homeowners' homes. The homeowners appealed challenging the trial court's conclusion that no taking had occurred. We affirmed the trial court and stated:

There has been no permanent physical occupation of any definable part of the homeowners' property, and there has been no transfer of a definable part of the homeowners' properties. To the contrary, the homeowners or tenants have continued to live in their homes. In essence, the homeowners' free use, enjoyment, and interest in their properties have not been impaired.

842 N.E.2d at 864.

Further, in *Rodman v. Wabash*, 497 N.E.2d 234, 242 (Ind. Ct. App. 1986), we held that sewer backup into a homeowner's basement six times over the course of a three-year period did not constitute a taking. In support of the trial court's grant of summary judgment in favor of the city, we stated as follows:

Six times from the spring of 1980 through the spring of 1983, city sewers have backed up into the Rodmans' basement. The record does not indicate how long the sewage remained in the basement after each episode or how long the use of the Rodmans' basement was seriously interfered with. We

10

find that short term interference, presumably for a few days, six times over the course of a three year period does not rise to the level of a taking.

There has been no permanent physical occupation of a definable part of the Rodmans' property, nor has there been a transfer of a definable part of their property. Nor has the City removed the Rodmans' right to exclude others from their property. We find the trial court correctly concluded no genuine issue of material fact existed on the Rodmans' federal constitutional claim and appropriately granted summary judgment to the City.

*Id.*

With respect to federal jurisprudence on the issue, federal courts similarly have held that isolated flooding events do not constitute a taking. "Isolated invasions, such as one or two floodings . . ., do not make a taking . . ., but repeated invasions of the same type have often been held to result in involuntary servitude." *Ridge Line, Inc. v. United States*, 346 F.2d 1346, 1357 (Fed. Cir. 2003) (quoting *Eyherabide v. United States*, 345 F.2d 565, 569 (Fed. Cl. 1965) (citations omitted)). "Generally speaking, property may be taken by the invasion of water where subjected to intermittent, but inevitably recurring, inundation due to authorized Government action." *Barnes v. United States*, 538 F.2d 865, 870 (Fed. Cl. 1976).

The Browns rely on a decision of the United States Supreme Court, *Arkansas Game and Fish Commission v. United States*, 133 S. Ct. 511 (2012), to support their argument that a taking occurred warranting a reversal of the trial court's decision. *Arkansas Game*, however, is distinguishable from the Browns' claim. In *Arkansas Game* the following facts were set forth and holding was announced:

Periodically from 1993 until 2000, the U.S. Army Corps of Engineers (Corps) authorized flooding that extended into the peak growing season for

11

timber on forest land owned and managed by petitioner, Arkansas Game and Fish Commission (Commission). Cumulative in effect, the repeated flooding damaged or destroyed more than 18 million board feet of timber and disrupted the ordinary use and enjoyment of the Commission's property. The Commission sought compensation from the United States pursuant to the Fifth Amendment's instruction: "[N]or shall private property be taken for public use, without just compensation." The question presented is whether a taking may occur, within the meaning of the Takings Clause, when government-induced flood invasions, although repetitive, are temporary.

. . . .

We rule today, simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection. When regulation or temporary physical invasion by government interferes with private property, our decisions recognize, time is indeed a factor in determining the existence *vel non* of a compensable taking.

133 S. Ct. at 515-22. *Arkansas Game,* therefore, did not change federal jurisprudence that held government-induced flooding, (*Pumpelly v. Green Bay Co.*, 13 Wall. 166, 177-78, 20 L. Ed. 557 (1871)), and seasonally recurring flooding, (*United States v. Cress*, 243 U.S. 315, 328 (1917)), and takings that are temporary in nature can be compensable (*United States v. Causby*, 328 U.S. 256, 266 (1946)). The United States Supreme Court reemphasized the point that takings claims turn on situation-specific factual inquiries. "[T]emporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." 133 S. Ct. at 521 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, n.12 (1982)).

The Browns have failed to establish that the single instance of flooding in September 2008 on the property where they have lived since 1978 constituted a compensable taking. The specific facts of his claim reveal that the flooding was the only such event in the thirty

years he had lived there. According to Brown, the water was on his property for a couple of days and then it was gone.

The Browns' claim also fails the analysis involving whether the flooding was the foreseeable result of authorized government action. *Arkansas Game*, 133 S. Ct. at 522. The United States Supreme Court cited *John Horstmann Co. v. United States*, 257 U.S. 138, 146 (1921), as illustrative of the holding that there is no compensable taking when the damage caused by the government action could not have been foreseen. Applying that analysis to the facts of the present case, we cannot conclude that the September 2008 flooding of the Browns' property was the predictable result of the City's actions. The evidence shows that the City had not received complaints about the Hotter Detention Facility after its completion and prior to the flooding in September 2008. Burkman testified that the facility worked according to its design, but that the September 2008 storms exceeded the capacity of the storm-water system. Thus, the flooding of the Browns' property was not a predictable result of the design and construction of the Hotter Detention Facility in 1987.

Furthermore, the flooding damage suffered by the Browns was not special or peculiar, for purposes of takings analyses. Burkman testified to the major flooding that occurred throughout Valparaiso during the period of time when the Browns' property flooded. City of Valparaiso qualified for federal disaster relief as a result of the storms and flooding, and the Indiana Governor declared Lake, Porter, and LaPorte counties a disaster as a result of the storm. The City sent a storm-water survey to its residents and received a response from approximately 180 residents that they suffered some sort of water-entry

13

problem as a result of the storms. Among those problems was water entering basements through windows and doors, sewer backup, storm water standing in back yards, and basement seepage. Retention ponds overflowed and caused flooding damage. Therefore, the evidence shows the Browns' flooding damage was neither special nor peculiar.

The trial court also rejected the Browns' contention that the City's alleged failure to comply with regulations of the Indiana Department of Natural Resources supports their takings claim. We agree with the trial court that such a claim would have relevance to the Browns' negligence claim against the City, but has no bearing on their inverse condemnation claim. *See Boyd v. State*, 976 N.E.2d 767, 770 (Ind. Ct. App. 2012) ("The Boyds' present challenge is really to the legality of the project, rather than to the legality of the taking. This state condemnation action is not a vehicle through which such claims may be litigated or relitigated.").

Because we affirm the trial court's judgment in favor of the City on the Browns' inverse condemnation claim, the City's cross-appeal issue is moot. We need not pass on this issue.

Affirmed.

MAY, J., and BAILEY, J., concur.

14