**Michael SPAULDING, Appellant–Respondent,**

**v.**

**Jerry WILLIAMS and Lisa Williams, Appellees–Petitioners.**

No. 27A04–0303–CV–113.

Court of Appeals of Indiana.

Aug. 14, 2003.

Karen A. Wyle, Bloomington, IN, Attorney for Appellant.

Deborah S. Burke, Marion, IN, Attorney for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Michael Spaulding ("Father") appeals the trial court's Order on Petition for Grandparents' Visitation, wherein the court granted Jerry and Lisa Williams ("Grandfather" and "Grandmother," respectively, and "Grandparents" collectively) visitation with their then four-year-old grandchild, D.S. Father presents several issues for review, which we consolidate as follows:

1. Whether the trial court followed United States Supreme Court and Indiana Court of Appeals precedent regarding standards of proof necessary to override restrictions that a fit, custodial parent has placed on a child's visitation with grandparents.

2. Whether the evidence supports the trial court's conclusion that Grandparents successfully rebutted the presumption favoring Father's visitation decision.

3. Whether the trial court abused its discretion when, in addition to granting Grandparents visitation, its order contained provisions regarding written communication and travel with D.B.

We affirm in part, reverse in part and remand with instructions.

### FACTS AND PROCEDURAL HISTORY

Father and Irma Marie Spaulding ("Mother") were married, but separated at the time D.B. was conceived. D.B. was born on December 18, 1998, which was after Father and Mother divorced. Subsequently, Mother had custody of D.B., and Father exercised visitation on an irregular basis. Father and Mother remained

friends following the divorce. Mother included Father in D.B.'s birthday celebrations, and Father spent Christmas mornings with D.B. at Father's parents' house. D.B. also spent time at Father's parents' home on other occasions.

In April 2002, Mother became ill and was hospitalized. Father and his parents took care of D.B. during this time. On April 21, 2002, Mother died, leaving Father as D.B.'s sole custodial parent. The trial court that entered the dissolution order in Father and Mother's divorce awarded Father custody of D.B.

After D.B.'s birth and before Mother's death, Grandparents, who are Mother's parents, were very involved in both Mother's and D.B.'s lives. Grandparents spent most weekends with D.B., and Grandmother was D.B.'s primary babysitter during the week while Mother worked. Grandparents enjoyed taking D.B. to the zoo, monster truck shows, and a Chuck E Cheese restaurant. D.B. called Grandparents his "own Mamaw and Pawpaw" because he was their only grandchild, unlike Father's parents, who had at least one other grandchild and whom D.B. called "Mamaw Sharon and Pawpaw Mike." Grandparents and D.B. had a close, strong relationship.

For several weeks following Mother's death, Father allowed Grandparents to visit with D.B. Grandparents visited with D.B. in their home, and D.B. would sometimes spend the night with them. During that time, D.B. resided with Father in Father's trailer and sometimes stayed with Father's parents. At some point just after Mother's death, Father and Grandparents agreed that D.B. should not return to the home where D.B. had lived with Mother. Father subsequently asked Grandfather, who was the personal representative of Mother's estate, whether Father and D.B. could move into Mother's home. Grandfather denied Father's request.

Thereafter, the relationship between Father and Grandparents, especially between Father and Grandfather, began to deteriorate. Father was upset because he alleged that Grandparents refused to give him certain toys and clothes for D.B. Father was also upset because Grandfather refused to allow him to move with D.B. into Mother's house.

At some point, Father began to restrict Grandparents' visitation with D.B. He no longer allowed D.B. to go to Grandparents' home. Rather, Grandparents had to visit with D.B. at Father's parents' home. Grandparents felt like they were constantly being supervised while they visited with D.B. On one occasion, Grandfather became emotional when he was saying goodbye to D.B. and told Father's mother that he hoped that no one ever tried to take her grandchild away. Grandfather's actions upset Father's mother and Father, which resulted in further visitation restrictions.

Father, who had been laid off from his job prior to Mother's death, accepted a position with a company in Virginia. He and D.B. moved to Virginia over a period of several weeks in late June and early July 2002. Father did not inform Grandparents that he and D.B. were moving, although D.B. had told them at some point, nor did Father provide Grandparents with contact information. Grandparents filed their Verified Petition for Grandparents' Visitation in June 2002. When Father and D.B. returned to Indiana over Labor Day weekend of 2002, Grandparents were able to stop by Father's parents' home and visit with D.B., which was the last time Grandparents saw D.B.

The trial court conducted a hearing on Grandparents' petition in October 2002. Several witnesses testified at the hearing, including Grandparents, Father, relatives

of both Grandparents and Father, and Mother's former neighbors and friends. At the conclusion of the hearing, the trial court took the matter under advisement, and on January 17, 2003, the court issued a fourteen-page order granting Grandparents' petition. That order contains approximately nine pages of factual findings in paragraph form entitled "Summary of Facts," in which the court summarized the testimony of each of the witnesses, followed by a "Decision" section, in which the court analyzed the facts in light of case law. The court's ultimate visitation order provides in relevant part:

> [T]he Court orders that petitioners shall have grandparent visitation for one weekend per month beginning Friday evening at 4:00 p.m. and ending on Sunday evening at 7:00 p.m. The grandparent weekend shall be the third weekend of every month. The parties may otherwise agree in writing to a modification hereof. In addition, petitioners shall have reasonable phone access to their grandchild at least consisting of 10 to 15 minutes per week depending upon the child's ability to communicate, at reasonable hours, and without unreasonable interference from father. If respondent uses an answering machine, voice mail, or pager, then messages left for the child shall be promptly communicated to the child and the call returned. The parties should agree on a specific time for calls so that the child may receive the call. All expense of transportation and telephone calls shall be borne by the petitioners.
>
> Mail. Petitioners shall have the right to communicate privately by e-mail, faxes, cards, letters, and packages without interference by respondent. Any such communication shall be promptly delivered by the respondent to the child.
>
> Emergency notification. For emergency notification purposes whenever the child travels out of the area with the petitioners, one of the following shall be provided to respondent: an itinerary of the travel dates, destinations, and plans where the child can be reached, or the name and telephone number of an available third person who knows where the child or petitioners may be located. The parties shall furnish each other at all times their current address and telephone number.
>
> Throughout all such visitation and communication with the child, the parties shall respect the role of the father and the grandparents and the child shall not be put in the middle of any conflict [between] the parties.

This appeal ensued.

## DISCUSSION AND DECISION

### Statutory Background and Standard of Review

As this court recently explained in *McCune v. Frey*, 783 N.E.2d 752, 755 (Ind. Ct.App.2003):

> [B]y enacting the Grandparent Visitation Act, [Indiana Code Section 31–17–5–1 *et seq.*,] our General Assembly has recognized that a child's best interest is often served by developing and maintaining contact with his or her grandparents. However, grandparents do not have the legal rights or obligations of parents, and do not possess a constitutional liberty interest in visitation with their grandchildren. In contrast, parents do have a constitutionally recognized fundamental right to control the upbringing, education, and religious training of their children. Furthermore, in our traditions and collective conscience, we have acknowledged that parents have the right to raise their children as they see fit. Therefore, when it drafted the Grandparent Visitation Act,

our General Assembly had to balance two competing interests: the rights of parents to raise their children as they see fit and the rights of grandparents to participate in the lives of their grandchildren.

Pursuant to the Act, a grandparent may seek visitation only if [ ] 1) the child's parent is deceased; 2) the child's parents are divorced; or 3) the child was born out of wedlock, but only if the child's father has established paternity. The trial court may grant a grandparent's petition for visitation if it determines that visitation is in the best interests of the child. Additionally, a trial court may modify an order granting or denying grandparent visitation rights any time [if] such modification would serve the best interests of the child.

(Quotations and citations omitted).

■■ The Act further requires that the trial court issue findings and conclusions when ruling on a grandparent's petition for visitation. *See* Ind.Code § 31–17–5–6 ("Upon hearing evidence in support of and opposition to a petition . . ., the court shall enter a decree setting forth the court's findings and conclusions."); *McCune,* 783 N.E.2d at 756. In its findings and conclusions, the trial court should address: (1) the presumption that a fit parent acts in his or her child's best interests; (2) the special weight that must be given to a fit parent's decision to deny or limit visitation; (3) whether the grandparent has established that visitation is in the child's best interests; and (4) whether the parent has denied visitation or has simply limited visitation. *McCune,* 783 N.E.2d at 757. In

determining the best interests of the child, the court may also consider whether a grandparent has had or has attempted to have meaningful contact with the child. *Id.*[1]

■■ On review from a trial court's order granting or denying grandparent visitation, we apply the familiar Indiana Trial Rule 52 standard, which provides that the court on appeal shall not set aside the findings or judgment unless clearly erroneous. *Woodruff v. Klein,* 762 N.E.2d 223, 226 (Ind.Ct.App.2002), *trans. denied.* In applying a two-tiered standard of review, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* "In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence to support the findings or the findings fail to support the judgment." *Id.* (citations and quotations omitted). We do not reweigh the evidence or determine witness credibility. *Id.* at 227. Rather, we consider only the evidence most favorable to the trial court's judgment, with all reasonable inferences drawn in favor of the judgment. *Id.*

### Issue One: Applicable Standard of Proof

■■ Father and Grandparents agree that there are a few, primary cases decided within the past three years relevant to grandparent visitation and the constitutional ramifications such visitation may have on a parent's fundamental right to raise his or her child. *See Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147

---

1. *McCune,* which was the first case to clearly establish certain substantive requirements for the trial court's findings and conclusions in grandparent visitation cases, was decided in February 2003, one month after the trial court issued its order in this case. Accordingly, although the trial court was not required to comply with *McCune,* its findings and conclusions address each of the factors we discussed in *McCune.* We commend the court on its thorough findings and conclusions.

L.Ed.2d 49 (2000); *McCune*, 783 N.E.2d at 758–59; *Woodruff*, 762 N.E.2d at 227–28; *Crafton v. Gibson*, 752 N.E.2d 78 (Ind.Ct. App.2001). Specifically, in *Crafton*, 752 N.E.2d at 98, this court ruled on the constitutionality of Indiana's Grandparent Visitation Act in light of the United States Supreme Court's plurality opinion in *Troxel*. In upholding the constitutionality of the Act, we discussed factors courts must take into consideration when determining a child's best interests under the Act.

First, courts are to "presume that a fit parent's decision is in the best interests of the child." *Crafton*, 752 N.E.2d at 96 (citing *Troxel*, 530 U.S. at 69, 120 S.Ct. 2054). Acting under this presumption, courts must give special weight to a parent's decision to deny or limit visitation. *See id.* at 96–97, 120 S.Ct. 2054. Second, a court should give some weight to the fact that a parent has agreed to some visitation. *Id.* at 97, 120 S.Ct. 2054. Still, while we must presume, under *Troxel*, that a fit parent's decision regarding visitation is in the child's best interests, that presumption is rebuttable. *Id.* at 97, 120 S.Ct. 2054. "Thus, a grandparent seeking visitation has the burden of rebutting the presumption that a decision made by a fit parent to deny or limit visitation was made in the child's best interest." *Id.* at 97, 120 S.Ct. 2054.

Here, Father asserts that the trial court failed to follow the applicable standard of proof set forth in the above cases in two ways: (1) the court failed to acknowledge that Father has continued to allow visitation between D.B. and Grandparents, and (2) the court failed to give the required deference and "special weight" to Father's visitation decisions. We address each argument in turn.

First, Father claims that the trial court's "conclusory statements that Father denied all visitation are not supported by the rec-ord." Although Father failed to provide specific references in his appellate brief to those "conclusory statements" to which he now objects, he did explain in a footnote in his Reply Brief that the court used the language "no visitation" and "flat denial of visitation." Contrary to Father's contentions, however, the court did acknowledge Father's decision to allow Grandparents' visitation for some period of time following Mother's death. Specifically, the court found, in relevant part, that upon Mother's death, "[Father] obtained custody and the visits with the grandparents were allowed for a few weeks after her death and visitations were supervised with his parents or him … and then trickled down to no visitations at all." The court further found that, for some period of time, Father allowed visitation with Grandparents only if Grandparents came to Father's parents' home. Those types of visits occurred seven or eight times, with the last visit occurring over Labor Day weekend of 2002.

In addition, our review of the transcript of the hearing and the court's order as a whole shows that both the parties and the court made a distinction between the unsupervised visitation Father permitted at the Grandparents' home and the more limited visitation he allowed, which took place at Father's parents' home. Stated differently, the court's references to Father denying visitation correlates with the testimony regarding Father's decision not to allow D.B. to go to Grandparents' home for unsupervised visitation anymore. For example, Grandfather testified that after Mother's death, D.B. spent the night with them two nights; but when Father became angry with Grandfather, Father stopped visitation. Grandfather later explained that thereafter, the "only way [Grandparents] could see [D.B.] at all [was] to go to their house and then [Grandparents were] guarded like [they were] in prison." Simi-

larly, Father testified that after Mother's death, he allowed D.B. to visit with Grandparents at their home four or five times. He admitted, however, that at some point he had "stopped allowing [D.B.] to go to their home." Father disputed that he made the decision not to allow D.B. to go to Grandparents' home because of the argument regarding Mother's house but, instead, he "decided to restrict visitation because of [Grandfather's] conduct in front of the child with [his] mother."

On appeal, Father has taken isolated phrases from the court's findings out of context. The findings that discuss Father's denial of visitation refer to the testimony at the hearing regarding Father's decision to no longer allow D.B. to visit with Grandparents unsupervised at their home, which D.B. had done on a regular basis prior to Mother's death. Thus, to Grandparents, and in the court's view, Father's actions amounted, in effect, to a denial of visitation. As the court stated in its findings when discussing the conflicts between Father and Grandparents:

> Because of [Father's] inability to communicate or that desire not to communicate, [Grandparents] have been shut out of that child's life to which they once played such a prominent and important part. [Father] told [Grandparents], "you made your bed now lie in it." *In effect visitation has been terminated for most practical purposes.*

(Emphasis added). We conclude that the court properly acknowledged that Father did allow Grandparents to visit with D.B. on a limited basis after Mother's death, and the record supports the determination that, at some point, Father stopped allowing D.B. to visit with Grandparents in the manner in which D.B. and Grandparents had enjoyed previously.

Next, Father contends that the trial court erred because it did not give proper deference to Father's decision to limit visitation. Specifically, he claims that the court "essentially ignored" Father's stated reasons for restricting visitation. We cannot agree. First, the trial court's conclusions expressly provide, in part, that "the Court has considered [Father's] decision to deny and limit visitation and gave special weight to that decision...." Most of Father's remaining argument on this issue amounts to a request that we reweigh the evidence, which we will not do. *See Woodruff,* 762 N.E.2d at 227.

But Father also attacks the trial court's conclusion that Father's motivation in restricting Grandparents' visitation was "selfish." [2] In particular, the court's conclusions provide in relevant part:

> While respondent asserts that he discontinued visitation with petitioners because he did not feel that the child should be stuck in the middle of the problems between himself and the maternal grandparents, and that he was "protecting [D.B.] from his grandfather's hurt and anger and that is a hurt that [D.B.] doesn't need," the Court finds that the facts show that his motivation was more selfish. Two days after the funeral of [D.B.'s] mother, respondent had a conversation with petitioners about him obtaining one of [Mother's] houses for himself and [D.B.]. The maternal grandparents did not want to put [D.B.] back in that house. From that point on, petitioners' visitation with the child diminished to nothing over a period of approximately four weeks. There was testimony that [Father] was going

---

**2.** Father failed to cite to the relevant portion of the court's conclusion he attacks. While we acknowledge the paragraph format of the court's findings and conclusions make it more difficult for citation purposes, Father nevertheless must provide proper citation.

to teach the child who he is going to live with.

Father's contention that the court's findings do not support its conclusion that his motivations were selfish lacks merit. The court's findings provide that Father "became angry when he could not retain one of three houses that belonged to [Mother] and he could not live in that house." Further, the court found that Grandparents felt it was not in D.B.'s best interest to return to the home and that, thereafter, "problems started and [Father] declared that he's going to have to teach the child who is he is going to live with, and approximately at that time there was a flat denial of visitation." Those findings support the court's conclusion that Father's motivation was more selfish than Father suggested at the hearing.

Father's final argument regarding the court's failure to defer to his alleged reasons for restricting visitation focuses on what it means to give a fit parent's visitation decisions "special weight," as that term was used in *Troxel*. Specifically, Father contends that "special weight" means that the trial court should give the parents' decision the same deference that this court on appeal gives decisions of the trial court. Father argues in his brief, in part, as follows:

> [W]here childrearing decisions are concerned, it is the *parent* who is in the position more commonly reserved for the trial court. The parent has the constitutional right and duty to weigh all pertinent facts, gathered over the years through intimate knowledge of the parties, and he is in a far better position than any judge to perform that task. A custodial parent's visitation decisions are presumed correct, just as a trial court's weighing of facts is presumed correct in cases where weighing the facts is the trial court's province. Therefore, just as

the Court of Appeals will not reweigh the facts when the trial court is the primary decisionmaker, *the trial court should not reweigh the facts underlying a decision entrusted to the parent.*

(Emphasis in original).

■ Nothing in *Troxel* or our cases following *Troxel* indicate that the trial court must accept a parent's reasons for denying or restricting visitation with grandparents as necessarily true. We agree with Grandparents that the "special weight" requirement does not "require a trial court to take at face value any explanation given by a parent." Contrary to Father's suggestions, the trial court in grandparent visitation matters must exercise the same duties it has in any other matter pending before it, namely, the duties of weighing the evidence and judging witness credibility. *See Woodruff*, 762 N.E.2d at 226–27 (discussing standard of review in grandparent visitation matter). Accordingly, it is the trial court's prerogative to listen to the evidence and determine, in light of that evidence, whether a parent's alleged justification for denying or restricting visitation with grandparents holds water. Here, the court's findings and conclusions, while properly acknowledging and considering Father's reasons for denying visitation, illustrate that the court did not find Father's explanation to be credible.

In sum, we conclude that the trial court followed relevant precedent and applied the correct standard of proof in evaluating Grandparents' petition for visitation.

### Issue Two: Rebuttable Presumption in Favor of Father's Decision

■ Next, Father claims that the trial court erred when it determined that Grandparents presented sufficient evidence to rebut the presumption that Father's decision regarding visitation is in

the child's best interests. Specifically, the trial court's conclusions provide in relevant part:

> The Court finds that respondent's decision to terminate a very important basic need of his four year old child—that of seeing his maternal grandparents who until [the child's] mother's death were a very important part of the child's daily life was not a decision of a fit parent with regard to the child's emotional needs. The evidence shows that with the assistance of respondent's family he did provide the basic physical needs of food, clothing and shelter and it is clear that he loves and cares for the child. However, respondent's denial of the child's emotional needs was not in the child's best interest. Petitioners have met their burden of overcoming a presumption that fit parents act in the best interest of the child. The Court has considered the father's decision to deny and limit visitation and gave special weight to that decision, but finding that decision for the same reasons stated that the denial of visitation was harmful to the child and was not in his best interest.

Father presents four arguments attacking the court's ultimate conclusion that Grandparents had met their burden of proof. However, two of those arguments amount to a request that we reweigh the evidence and are not supported by proper citation to authority or the record. *See* Brief of Appellant at 24, 28 (asserting that Grandparents' stated reasons for seeking visitation are insufficient to overcome presumption and challenging conclusion that Father's decision to restrict visitation was harmful to D.B.).[3] Father's remaining arguments are as follows: (1) the trial court erred when it distinguished between his overall fitness as a parent and his fitness regarding the visitation decision; and (2) the court erred when it found *Woodruff* distinguishable.

Father claims that the court erred when it found him to be a fit parent but then determined that his decision to restrict visitation with Grandparents was "not a decision of a fit parent with regard to the child's emotional needs." According to Father, a parent is either fit or unfit, and if the court finds the parent to be fit, it may not avoid deferring to the parent's decision by concluding that a particular decision is not one a fit parent would make. However, we find our decision in *Crafton*, 752 N.E.2d at 96, dispositive. In that case, there was no allegation that the parent was unfit. Nevertheless, following *Troxel*, we concluded that the grandparents had "the burden of rebutting the presumption that a decision made by a fit parent to deny or limit visitation was made in the child's best interest." *Id.* at 96–97, 120 S.Ct. 2054 (citing *Troxel*, 530 U.S. at 87, 120 S.Ct. 2054). The trial court in this case followed *Crafton* when it determined that although Father was an otherwise fit parent, his decision to restrict visitation was not in D.B.'s best interests.

Father also challenges the trial court's conclusion that the facts in *Woodruff* are distinguishable from the facts here. In *Woodruff*, 762 N.E.2d at 225–226, the trial court denied grandmother's petition seeking visitation, and we affirmed that decision on appeal. The grandmother in that case maintained a "typical grandparent re-

---

**3.** In response to Father's argument that the evidence does not show that D.B. was harmed by Father's decision, Grandparents assert that proof of harm to the child is not necessary to rebut the presumption favoring a parent's visitation decisions. But Father clarified in his reply brief that he has not raised that contention on appeal. Therefore, we need not address that issue.

lationship" with the child. *Id.* at 225. In particular, at times the mother would take the child to grandmother's house for the day and grandmother would spend time with the child at family gatherings. *Id.* After the mother died of cancer, grandmother's relationship with the father deteriorated, and grandmother eventually petitioned the court for visitation with the child. *Id.* at 225–26.

We agree with Father that this case shares some similarities with *Woodruff,* namely, the mothers in both situations died and the relationships between the surviving fathers and maternal grandparents became strained. But the trial court here distinguished *Woodruff* on the specific basis that Grandparents, unlike the grandmother in that case, "were not in a 'typical grandparent relationship' with the child with occasional visits." Rather, as the court's conclusions provide:

> For approximately three years and five months, [Grandparents] saw and/or cared for their grandchild almost every day of the week. [Grandmother] was the primary care giver/babysitter during the week when her daughter, the child's mother, was at work, and on the weekends [Grandfather and Grandmother] routinely had the grandson since [Grandfather] was a truck driver who was gone through the week.... [Grandparents] had acted in the past three and a half years more like parents to the child than as typical grandparents.... Clearly the relationship of the child with his "own Mamaw and Pawpaw" was and is very special and important not only to the maternal grandparents but to this four year old child. The strength of this relationship was corroborated by all the witnesses including respondent father who described their relationship as "strong," and he acknowledged that [D.B.] misses the maternal grandparents.

We find no error with the distinctions the trial court made between this case and *Woodruff,* and the trial court's conclusion that Grandparents met their burden of overcoming the presumption that Father's decision to restrict visitation was in D.B.'s best interests is not clearly erroneous.

### Issue Three: Written Communications, Packages and Travel

 Finally, Father contends that the trial court's order concerning Grandparents' written communications, packages and travel with D.B. is overly broad and infringes upon his fundamental right to raise D.B. Specifically, Father objects to the language in the court's order, which provides that Grandparents "shall have the right to communicate privately by e-mail, faxes, cards, letters, and packages *without interference by respondent.*" (Emphasis added). Father points out that, unlike the provision which allows for telephone contact with D.B. without unreasonable interference from Father, the court's order allows Grandparents to send written communications and packages without any interference from Father. Father also objects to the provision in the order concerning emergency notification and travel. He alleges that according to the order, Grandparents may travel with D.B. "out of the area" as long as Grandparents provide Father with contact information. Father asserts that the court's order places "no restrictions on how far [Grandparents] may take [D.B.] or by what means of transportation."

In response to Father's claims, Grandparents remind us that the trial court included provisions regarding written communication and travel sua sponte and that their sole request was for the court to grant them visitation. Grandparents concede that the wording of the order "may be outside the bounds of the contact in-

tended by the Grandparent Visitation statute."

As Father points out, Indiana's Grandparent Visitation Act was enacted in derogation of the common law and created rights which did not previously exist. *In re Visitation of J.P.H.*, 709 N.E.2d 44, 47 (Ind.Ct.App.1999). Accordingly, the Act must be strictly construed. *Id.* As our supreme court explained in *Dunson v. Dunson*, 769 N.E.2d 1120, 1124 (Ind.2002), " '[w]hen the legislature enacts a statute in derogation of the common law, this Court presumes that the legislature is aware of the common law, and does not intend to make any change therein beyond what it declares either in express terms or by unmistakable implication.' " (Citation omitted).

The Grandparent Visitation Act does not address contact between grandparents and grandchildren other than "visitation," a term that our legislature has not defined. Because Father does not raise a general challenge to the court's decision to allow contact other than actual visitation, we need not address whether such contact falls within the scope of the Act. Still, we agree with Father that any contact or communication ordered, other than visitation, should be applied narrowly to preserve and protect a parent's rights.

Although neither party references the Indiana Parenting Guidelines, Indiana Parenting Guidelines, Section I(A)(4) and (5), provide in relevant part:

SECTION I. GENERAL RULES APPLICABLE TO PARENTING TIME
A. COMMUNICATIONS

* * *

4. With A Child By Mail. A parent and a child shall have a right to communicate privately by e-mail and faxes, and by cards, letters, and packages, without interference by the other parent.

5. Emergency Notification. For emergency notification purposes, whenever a child travels out of the area with either parent, one of the following shall be provided to the other parent: An itinerary of travel dates, destinations, and places where the child or the traveling parent can be reached, or the name and telephone number of an available third person who knows where the child or parent may be located.

(Commentary omitted). While the Parenting Guidelines do not apply to grandparent visitation matters, *see* Ind. Parenting Time Guidelines, Scope of Application, 1, it is clear that the trial court referred to parts of those guidelines in drafting its order granting Grandparents' visitation petition. Indeed, the language of the court's order concerning written communication and travel with D.B. mirrors subsections (4) and (5) of the Parenting Guidelines regarding communications.

Although the Grandparent Visitation Act is silent on what the term "visitation" means, the Act focuses on the child's best interests. *See* Ind.Code § 31–17–5–2. The trial court's order in this case indicates that the court determined that, in addition to monthly weekend visits with D.B., the child's best interests would be served by having additional types of contact with D.B., including written communications and travel time. But the parties in this case are not both parents. The trial court acknowledged that fact in the final paragraph of its conclusions when it noted: "Throughout all such visitation and communication with the child, the parties shall respect the role of the father and the grandparents and the child shall not be put in the middle of any conflict with the parties."

Nevertheless, by borrowing language wholesale from the Parenting Guidelines, those parts of the order concerning written communications, packages and travel erroneously treat Grandparents as if they were parents. Instead, the court should have modified the language which appears in the Parenting Guidelines to acknowledge the primacy of Father's parental role. Specifically, the provision that allows for Grandparents to send written communications and packages to D.B. without interference from Father is too broad. Rather, we suggest that the court insert the same "unreasonable" language that it included in the telephone contact provision, so that Grandparents would be permitted to send written communications and packages to D.B. without *unreasonable* interference from Father. That qualification would preserve Father's parental role and allow him reasonable discretion in overseeing the communications between Grandparents and D.B.

Similarly, the provision that allows for Grandparents to travel "out of the area" with D.B. fails to provide Father any say over when, where or under what circumstances Grandparents may travel with D.B. If, for example, Grandparents travel to Virginia to exercise their monthly weekend visitation and wish to take D.B. on a weekend trip "out of the area," Grandparents should be required to receive Father's permission, in addition to providing Father with emergency contact information. In addition, if D.B. visits with Grandparents in Indiana and Grandparents want to travel with the child, they should first obtain Father's permission. And Father must use reasonable discretion in allowing Grandparents to travel with D.B. In sum, we reverse the two parts of the court's order regarding written communications, packages and travel and remand for the trial court to revise those provisions consistent with this opinion.

Affirmed in part, reversed in part and remanded.

BROOK, C.J., and BAILEY, J., concur.