**Jennifer M. MEGYESE, Appellant–Respondent,**

v.

**Anthony C. WOODS and Bobbie J. Woods, Appellees–Petitioners.**

**No. 71A03–0401–CV–33.**

Court of Appeals of Indiana.

May 28, 2004.

Robert L. Jones, Joanmarie Ilaria Davoli, Mary Frances Blazek, South Bend, IN, Attorneys for Appellant.

Julie P. Verheye, Mishawaka, IN, Attorney for Appellees.

## OPINION

SHARPNACK, Judge.

Jennifer Megyese ("Mother") appeals the trial court's grant of visitation to Anthony Woods ("Grandfather") and Bobbie Woods ("Grandmother") (collectively, "Grandparents"). Mother raises one issue, which we restate as whether the trial court's order granting Grandparents visitation with G.W. and J.W. (collectively, the "Children") is clearly erroneous. We affirm.

The relevant facts follow. Mother and Terrell Woods ("Father") had two children, G.W., born August 24, 2000, and J.W., born September 7, 2001. Father's paternity of G.W. was established by the St. Joseph County Probate Court, and shortly after J.W.'s birth, Father signed an affidavit acknowledging that he was J.W.'s father.

Mother and Father moved in with Grandparents shortly before G.W. was born. While Mother was pregnant with G.W. and after G.W. was born, Grandmother took Mother to all of her doctor's appointments. G.W. was colicky, and Grandmother also helped Mother care for G.W. at night when she was crying, and sometimes Grandmother would take G.W. to bed with her. Grandmother also helped Mother find a job, and when Mother went back to work, Grandmother drove G.W. to and from her babysitter. On one occasion, Mother told Grandmother, "[G.W.] is more attached to you than to me," and she told Grandmother that she was her "guardian angel." Transcript at 13, 16.

About four months after G.W. was born, Mother moved out of Grandparents' house and into an apartment. After Mother moved, Grandmother became concerned about Mother and G.W. because Mother "appeared to be down and not wanting to do anything or get up and clean [herself

up] or take care of [G.W.] like she should." *Id.* at 18. Grandmother told Mother that she needed to take better care of herself and G.W. During this time, Grandparents continued to have contact with Mother and G.W.

Approximately three months later, Mother moved to her parents' house and cut off contact between Grandparents and G.W. Approximately two to three months later, Mother began to visit Father who was still living at Grandparents' house. On September 7, 2001, Mother and Father's second child, J.W., was born. When J.W. was born, Mother was living with her parents, but about two weeks after his birth, she went to live with Father at Grandparents' house. Mother, Father, and the Children moved into an apartment about one month later but only stayed there for about two weeks because Mother and Father split up. Mother and the Children moved back to Mother's parents home, and approximately three months later, Grandparents helped Father get court ordered visitation rights with the Children. Grandparents then saw the Children during Father's visitation. Father was murdered on February 7, 2003, and after Father's funeral, Grandmother called Mother and asked her if she could see the Children. Mother said that she could, but despite Grandmother's repeated requests to visit the Children, a visit was never arranged.

Grandparents then filed for grandparent visitation. Mother objected to Grandparents' request for visitation, and the trial court held a hearing. During the hearing, Grandmother testified that she desired visitation with the Children because "both sides make a whole," and "we can give to them just as her family have things that they can give to them as well. I think we are a loving family. We have other grandkids, we love them dearly. We love all our

grandkids dearly. That's all we want, we just want to be a part of them, to have . . . them . . . know us, and us to know them, and contribute the love that we have for them." *Id.* at 32–33. During the hearing, Grandfather said that he desired visitation with the Children because "I'd like to spend as much time as I can with my grandkids to offer whatever advice I could give them . . . . we don't want the kids, we have already raised our kids. It's just the idea, we want to see our grandkids, that's what it all boil[s] down to." *Id.* at 51–52.

Mother testified that when she starting dating Father, she and Grandmother had a good relationship, but when Father became abusive, her relationship with Grandmother deteriorated. Mother said that on one occasion, she and Father fought, and Father "busted [her] head open." *Id.* at 104. Mother told Father that he had to leave, Grandmother picked Father up, and Grandmother told Mother she would "whip [Mother's] ass up and down Main Street if she [was not] able to see her grandbabies." *Id.* at 103–104. Grandmother also took some clothes, which she had given G.W. and told Mother that she would give them back when she got back together with Father. Grandmother denied making any threatening statements to Mother but said that she did take G.W.'s clothes to wash them.

Mother also testified that Grandparents' house was not safe for the Children. Mother said that she had seen Grandfather smoke marijuana in his house and was concerned about cousins carrying handguns in Grandparents' house. Grandparents disputed Mother's assertion that Grandfather smoked marijuana in the house, and Grandmother said that she had never let any of her relatives come to her house with a gun. Mother was also concerned about Children spending time with Grandparents' extended family because

two weeks after Father was murdered, Grandparents' niece was shot and killed.

Mother said that Grandparents have "no relationship" with J.W., and Grandfather has had little contact with G.W. *Id.* at 118. Mother also said that Grandparents question whether J.W. is Father's child and have requested that J.W. get a blood test in order to determine his paternity. Grandfather admitted that he has questioned J.W.'s paternity, but said, "[m]y son accepted him, so I have to go along with my son's wishes." *Id.* at 57. Likewise, Grandmother said, "[m]y son signed the paperwork, and as far as I am concerned, that's my grandchild. I would treat him just like I do with the rest, any of the rest, with loving care." *Id.* at 132. Mother said that because Grandparents question whether J.W. is Father's son, Grandparents treat G.W. and J.W. differently. Grandmother denied this accusation.

J.W. has separation anxiety and will "scream bloody murder" if he is separated from Mother. *Id.* at 117. Mother has not told the Children about the circumstances surrounding Father's murder, and she is concerned that Grandparents will tell the Children about the circumstances of Father's murder against Mother's wishes. Grandmother said that she would not discuss the circumstances surrounding Father's murder with the Children.

After the hearing, the trial court issued an order granting Grandparents visitation rights with the Children. The trial court's findings of fact were as follows:

[G.W.] is the three year old child (d.b. 8/24/00) of [Mother] and [Father], who was murdered on February 7, 2003. [Mother] and [Father] never married. [Father's] paternity was established by the St. Joseph Probate Court.

[J.W.] is the two year old child (d.b. 9/7/01) of [Mother] and [Father] pursuant to the Paternity Affidavit signed by [Father] and [Mother] on September 8, 2001, a copy of which was attached to [Grandparents'] petition. [Grandparents] are the parents of the late [Father] and, therefore, the grandparents of [the Children].

[Grandparents] met [Mother] in 1999 when she and [Father] were dating. [Mother] and [Father] visited [Grandparents'] home frequently. When [Mother] became pregnant with [G.W.] in 2000, [Grandmother] often took her to her appointments with the doctor. Following [G.W.'s] birth on August 24, 2000, [Father], [Mother], and [G.W.] moved in with [Grandparents]. [Grandmother] was actively involved in the "hands on" care of [G.W.] from birth until the three left [Grandparents'] home in December of 2000 and took up residency in Carriage House Apartments. During that period both [Grandmother] and [Mother] described their relationship as good.

In the winter of 2001 [Mother] and [Father] separated. [Mother] returned with [G.W.] to her parents' house. Notwithstanding [Grandmother's] efforts to keep in touch with [G.W.], contact "was cut off" at that juncture by [Mother], apparently at the behest of her parents.

During the ensuing months, the extent to which [Grandparents] saw [G.W.] depended upon the state of the relationship between [Mother] and [Father]. When their relationship was good [Grandparents] saw [G.W.] When they were bad, they did not.

On September 7, 2001 [J.W.] was born. When [Mother] was released from the hospital, she, [Father, and the Children] once again moved back into [Grandparents'] home. They resided there for about one month when they relocated to an apartment for a brief period. [Mother] and [Father] split up again, with [Mother] returning to her

parents' home. Consistent with the pattern of her previous return to the home of her parents, [Grandmother's] visits with [the Children] came to an abrupt end at that juncture.

In the meantime, [Father] petitioned the court for parenting time with [G.W.] which was granted around August or September of 2002. [Grandparents] began to see [the Children] during [Father's] parenting time periods. That was the situation until [Father's] death on February 7, 2003.

Following [Father's] funeral [Grandmother] and [Mother] conversed concerning [Grandmother's] wish to see [the Children]. [Mother] initially agreed. Notwithstanding, [Grandmother's] repeated requests, however, [Mother] has allowed no contact since [Father's] death.

In her testimony [Grandmother] expressed her desire to be "a part of" [the Children's] lives, believing "both sides make a whole." She described her large family as "loving," and felt that [the Children's] best interest would be served by being a part of it. In his testimony [Grandfather] expressed a desire to be a grandparent to [the Children] just as he is to his other grandchildren.

In her testimony [Mother] expressed a commendable position: "I want my children to be safe." Nonetheless her feeling that [Grandparents] live in "an unsafe environment" simply was unsupported by any credible, cogent evidence. [Grandparents] appear to be responsible, productive people. They are blessed with a supportive family and circle of friends. The court is unprepared to make a quantum leap of logic that would suggest that because [Father] died a violent death, [the Children] are somehow at risk by being in the presence of [Father's] parents.

Appellant's Appendix at 3–5. The trial court's conclusions of law were as follows:

[Mother's] decision to prevent any visitation by [Grandparents] must, of course, be given "special weight" pursuant to *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.E.2d 49, and the Indiana cases that have applied and followed it. Accordingly, a presumption exists that her decision is in [the Children's] best interests. Nonetheless, "... this presumption is rebuttable and the petitioning grandparent has the burden of rebutting this presumption." *Crafton v. Gibson*, [752 N.E.2d 78, 98 (Ind.Ct.App.2001) ].

Accordingly, it is the trial court's prerogative to listen to the evidence and determine, in light of that evidence, whether a parent's alleged justification for denying or restricting visitation with grandparents holds water. *Spaulding v. Williams*, [793 N.E.2d 252, 260 (Ind.Ct.App.2003) ].

The greater weight of the evidence:

(a) rebuts [Mother's] decision to terminate contact with [Grandparents], the reasons for which appear unfounded; and

(b) supports the proposition that visitation with their paternal grandparents is in [the Children's] best interests.

*Id.* at 5–6.

The sole issue is whether the trial court's order granting Grandparents visitation with the Children is clearly erroneous. Ind.Code § 31–17–5–1 (1998) governs grandparent visitation rights, and provides that:

(a) A child's grandparent may seek visitation rights if:

(1) the child's parent is deceased;

(2) the marriage of the child's parents has been dissolved in Indiana; or

(3) subject to subsection (b), the child was born out of wedlock.

(b) A court may not grant visitation rights to a paternal grandparent of a child who is born out of wedlock under subsection (a)(3) if the child's father has not established paternity in relation to the child.

Ind.Code § 31–17–5–2 (1998) provides that:

(a) The court may grant visitation rights if the court determines that visitation rights are in the best interests of the child.

(b) In determining the best interests of the child under this section, the court may consider whether a grandparent has had or has attempted to have meaningful contact with the child.

On review from a trial court's order granting or denying grandparent visitation, we apply the familiar Ind. Trial Rule 52 standard, which provides that we may not set aside the findings or judgment unless clearly erroneous. *Woodruff v. Klein,* 762 N.E.2d 223, 226 (Ind.Ct.App. 2002), *trans. denied.* In applying a two-tiered standard of review, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* "In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence to support the findings or the findings fail to support the judgment." *Id.* (citations and quotations omitted). We do not reweigh the evidence or determine witness credibility. *Id.* at 227. Rather, we consider only the evidence most favorable to the trial court's judgment, with all reasonable inferences drawn in favor of the judgment. *Id.*

Mother argues that the trial court's order granting Grandparents visitation with the Children is clearly erroneous because: (A) the trial applied the incorrect legal standard by failing to accord a presumption in favor of Mother's decision to deny visitation; and (B) the trial court failed to make specific findings of fact as required by the Grandparent Visitation Act ("Act"), Ind.Code §§ 31–17–5–1 –10, and T.R. 52(A)(3). We will address each of Mother's arguments separately.

## A.

The first issue is whether the trial court's order is clearly erroneous because it applied the incorrect legal standard by failing to accord a presumption in favor of Mother's decision to deny visitation. Our grandparent visitation statute is a legislative recognition that a child's best interest is often served by developing and maintaining contact with his or her grandparents. *Swartz v. Swartz,* 720 N.E.2d 1219, 1221 (Ind.Ct.App.1999). "Grandparents are members of the extended family whom society recognizes as playing an important role in the lives of their grandchildren, the importance of which has been given added meaning by the legislature's policy judgment underlying the Act." *Sightes v. Barker,* 684 N.E.2d 224, 230 (Ind.Ct.App.1997), *trans. denied.* When determining whether to grant or deny grandparent visitation, trial courts are to "presume that a fit parent's decision is in the best interests of the child." *Crafton v. Gibson,* 752 N.E.2d 78, 96 (Ind.Ct.App. 2001) (citing *Troxel v. Granville,* 530 U.S. 57, 69, 120 S.Ct. 2054, 2062, 147 L.Ed.2d 49 (2000)). Acting under this presumption, trial courts must give special weight to a parent's decision to deny or limit visitation. *Id.* at 96–97. A trial court should also give some weight to the fact that a parent has agreed to some visitation. *Id.* at 97. Still, while we must presume that a fit parent's decision regarding

visitation is in the child's best interests, that presumption is rebuttable. *Id.* at 97. "Thus, a grandparent seeking visitation has the burden of rebutting the presumption that a decision made by a fit parent to deny or limit visitation was made in the child's best interest." *Id.* Here, Grandparents had the burden of rebutting the presumption that Mother's decision not to allow visitation was in the Children's best interest.

Mother argues that the trial court applied a presumption in favor of Grandparents that required Mother to prove that grandparent visitation would not be in the Children's best interests. She insists that the trial court ignored portions of her testimony wherein she said that grandparent visitation would not be in the Children's best interest. For example, Mother expressed concern about Grandparents' extended family members who were often at Grandparents' house, including cousins who carried handguns in Grandparents' house. Mother also expressed concern about the fact that she felt that Grandparents treated the Children differently because they question whether J.W. is Father's son. Mother also expressed concern that Grandparents would discuss the circumstances surrounding Father's death with the Children against her wishes, and she was concerned about the fact that Grandfather smoked marijuana in the house. However, Grandparents specifically disputed each of these allegations.

■ "Nothing in *Troxel* or our cases following *Troxel* indicate that the trial court must accept a parent's reasons for denying or restricting visitation with grandparents as necessarily true." *Spaulding,* 793 N.E.2d at 260. Moreover, the "special weight requirement does not require a trial court to take at face value any explanation given by a parent." *Id.* (internal quotations omitted). Rather,

"the trial court in grandparent visitation matters must exercise the same duties it has in any other matter pending before it, namely, the duties of weighing the evidence and judging witness credibility." *Id.* "It is the trial court's prerogative to listen to the evidence and determine, in light of that evidence, whether a parent's alleged justification for denying or restricting visitation with grandparents holds water." *Id.* Therefore, here, the trial court was not obligated to blindly accept Mother's assertions about Grandparents and was free to weigh the evidence and judge the witnesses' credibility.

■ The record indicates that Grandparents had developed a close relationship with the Children. The Children had, from time to time, lived at Grandparents' house. After G.W. was born, Grandmother would often help Mother care for her and would sometimes bring G.W. to bed with her, and on one occasion, Mother told Grandmother, "[G.W.] is more attached to you than me." Transcript at 13. When Mother and the Children were not living with Grandparents, Grandparents consistently sought to visit with the Children, and when Mother and Father separated, Grandparents assisted Father in getting court awarded visitation rights with the Children. Grandparents would visit with the Children during Father's visitation. After Father's death, Mother completely cut off Grandparents' contact with the Children.

During the hearing, Grandmother said that she wanted visitation with the Children because, "we can give to them just as her family have things that they can give to them as well. I think we are a loving family. We have other grandkids, we love them dearly. We love all our grandkids dearly. That's all we want, we just want to be a part of them, to have … them … know us, and us to know them, and con-

tribute the love that we have for them." *Id.* at 32–33. Grandfather said that he wanted visitation with the Children because, "I'd like to spend as much time as I can with my grandkids to offer whatever advice I could give them .... we don't want the kids, we have already raised our kids. It's just the idea, we want to see our grandkids, that's what it all boil[s] down to." *Id.* at 51–52.

In granting visitation rights to Grandparents, the trial court recognized that a presumption exists that Mother's decision is in the Children's best interests, but found that Grandparents met their burden of rebutting that presumption. *See Crafton,* 752 N.E.2d at 97. The trial court also concluded that Mother's reasons for denying visitation were unfounded and noted that Grandparents appeared to be "responsible, productive people," who are "blessed with a supportive family and circle of friends." Appellant's Appendix at 5. The trial court also noted that Mother had completely terminated any contact between Grandparents and the Children. The trial court was required to weigh the evidence and judge the witnesses' credibility in order to determine whether Mother's "alleged justification for ·denying or restricting visitation with grandparents holds water." *Spaulding,* 793 N.E.2d at 260. Here, the trial court, after listening to the testimony, concluded that awarding Grandparents' visitation with the Children was in the Children's best interests. The trial court did not fail to accord a presumption in favor of Mother's decision to deny visitation. Rather, it weighed the evidence and concluded that Mother's reasons for denying visitation were unfounded. Based upon our review of the record, we cannot say that there is no evidence to support the findings or that the findings fail to support the judgment. *See, e.g., Spaulding,* ·793 N.E.2d at 260.

### B.

Mother also argues that the trial court's order is clearly erroneous because the trial court failed to make· specific findings of fact and conclusions thereon as required by the Act and Ind. T.R. 52(A)(3).[1] Ind. Code § 31–17–5–6 (1998) provides that: "Upon hearing evidence in support of and opposition to a petition filed under this chapter, the court shall enter a decree setting forth the court's findings and conclusions." In *McCune v. Frey,* we held that when a trial court issues an order granting or denying grandparent visitation, it is required to issue findings of fact and conclusions of law, addressing:

(1) the presumption that a fit parent acts in his or her child's best interests;

(2) the special weight that must be given to a fit parent's decision to deny or limit visitation;

(3) whether the grandparent has established that visitation is in the child's best interests; and

(4) whether the parent has denied visitation or has simply limited visitation.

---

1. T.R. 52(A)(3) provides that:
 In the case of issues tried upon the facts without a jury or with an advisory jury, the court shall determine the facts and judgment shall be entered thereon pursuant.to Rule 58. Upon its own motion, or the written request of any party filed with the court prior to the admission of evidence, the court in all actions tried upon the facts without a jury or with an advisory jury (except· as provided in Rule 39[D]) shall find the facts specially and state its conclusions thereon. The court shall make special findings of fact without request
 
 * * * * *
 
 (3) in any other case provided by these rules or by·statute.

783 N.E.2d 752, 757 (Ind.Ct.App.2003). We added that the trial court "may consider whether a grandparent has had or has attempted to have meaningful contact with the child." *Id.*

 The trial court expressly entered findings of fact and conclusions thereon, therefore satisfying the requirements of T.R. 52 and I.C. § 31–17–5–6, so we must determine whether the trial court complied with the more specific requirements of *McCune.* An examination of the trial court's order reveals that first, the trial court noted that "a presumption exists that [Mother's] decision is in [the Children's] best interests," and second, it acknowledged that "[Mother's] decision to prevent any visitation by [Grandparents] must, of course, be given 'special weight.'" Appellant's Appendix at 5–6. Third, the trial court entered findings that supported its conclusion that Grandparents' visitation is in the Children's best interests. For example, the trial court found that following G.W.'s birth, Mother and Father moved in with Grandparents, and Grandmother was "actively involved in the 'hands on' care of [G.W.] from birth until the three left [Grandparents'] home in December of 2000 and took up residency in Carriage House Apartments." *Id.* at 4. The trial court also found that after J.W. was born, Mother, Father, and the Children, once again, moved in with Grandparents, and that after Mother and Father separated, Grandparents would visit the Children during Father's parenting time periods. The trial court also found that after Father's death Grandmother asked Mother if she could see the Children. While Mother initially agreed, she never allowed Grandmother to visit with the Children, despite Grandmother's repeated requests to see the Children. The trial court also included some of Grandmother's testimony, wherein she expressed a desire to have a relationship with the Children and be a part of their lives because "both sides make a whole." *Id.* at 5. The trial court ultimately concluded that "[t]he greater weight of the evidence: ... supports the proposition that visitation with their paternal grandparents is in [the Children's] best interests." *Id.* at 6. The trial court also addressed Mother's reasons for denying Grandparents' visitation, concluding that such reasons were "unfounded." *Id.* at 6. Finally, the trial court entered findings indicating that Mother had completely denied Grandparents visitation with the Children as opposed to simply limiting Grandparents' visitation. Specifically, the trial court found that shortly after J.W.'s birth, "[Grandmother's] visits with [the Children] came to an abrupt end." *Id.* at 4. Again, the trial court also found that after Father's death Mother has allowed no contact between Grandparents and the Children, despite Grandmother's repeated requests to see the Children.

Based upon our review of the trial court's order, we conclude that the trial court complied with the requirements of the Act, T.R. 52(A)(3), and *McCune.* The trial court did not fail to make specific findings of fact and conclusions thereon, explaining why Grandparents' visitation is in the Children's best interests.

In summary, the trial court did not fail to accord a presumption in favor of Mother's decision to deny visitation. Rather, it weighed the evidence and concluded that Mother's reasons for denying visitation were unfounded. Moreover, the trial court did not fail to make specific findings of fact and conclusions thereon, explaining why Grandparents' visitation is in the Children's best interests. Therefore, the trial court's order granting Grandparents visitation with the Children is not clearly erroneous.

For the forgoing reasons, we affirm the judgment of the trial court awarding Grandparents visitation rights with the Children.

Affirmed.

DARDEN, J. and ROBB, J. concur.