# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**LAURIE BAIDEN BUMB**
Bumb & Vowels, LLP
Evansville, Indiana

**THOMAS A. MASSEY**
Massey Law Offices
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**KEITH W. VONDERAHE**
**MOLLY E. BRILES**
Ziemer Stayman Weitzel & Shoulders LLP
Evansville, Indiana



FILED
Jan 13 2015, 6:36 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE VISITATION OF L-A.D.W | ) | |
| | ) | |
| R.W., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1402-DR-82 |
| | ) | |
| M.D. AND W.D., | ) | |
| | ) | |
| Appellees-Petitioners. | ) | |

**APPEAL FROM THE VANDERBURGH SUPERIOR COURT**
The Honorable Mary Margaret Lloyd, Judge
Cause No. 82D04-1305-DR-465

**January 13, 2015**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

Appellant/Respondent, R.W. ("Father"), appeals the trial court's order granting Appellees/Petitioners, M.D. ("Grandmother") and W.D. ("Grandfather") (collectively, "Grandparents"), grandparent visitation with his minor daughter, L.W. Grandparents are the parents of L.W.'s mother ("Mother"). They acted as caregivers for L.W. during significant periods of her life and petitioned for grandparent visitation after Mother died from cancer. The trial court found that, although Father was a fit parent, Grandparents had rebutted the legal presumption that his decisions about Grandparents' visitation were in L.W.'s best interests because there was evidence that he intended to deny grandparent visitation absent a court order. As a result, the trial court awarded Grandparents scheduled visitation.

On appeal, Father argues that the trial court erred in granting Grandparents visitation because (1) it did not give his decisions regarding visitation special weight; (2) it misrepresented the amount of visitation he had allowed Grandparents; and (3) Grandparents did not rebut the presumption that his decisions concerning L.W.'s interests were in her best interests. Alternately, he argues that the amount of visitation the trial court awarded Grandparents exceeds that contemplated by the Grandparent Visitation Act. Because the trial court did give Father's decisions regarding visitation special weight, did not misrepresent the amount of visitation Father had allowed and intended to allow Grandparents, and did not err in concluding that Grandparents had rebutted the presumption in favor of a fit parent's decisions regarding grandparent visitation, we conclude that the trial court did not err in granting Grandparents visitation. However, we

agree that the trial court abused its discretion in the amount of visitation it awarded Grandparents, and we remand to the trial court to amend the amount of visitation awarded.

We affirm in part, reverse in part, and remand.

## ISSUES

1. Whether the trial court erred in granting Grandparents visitation with L.W.

2. Whether the trial court abused its discretion in the amount of visitation it granted Grandparents.

## FACTS

Mother and Father (collectively, "the Parents") married in 2002. They had one child together, L.W., who was born in January 2005 in North Carolina. Mother is the only child of her parents, Grandparents, and L.W. is Grandparents' only grandchild. After L.W.'s birth, Grandparents lived with the Parents so that they could take care of L.W. while Mother continued her work as a pediatric dentist and Father completed his medical school residency. During this time, Grandparents did "everything you do for a newborn baby." (Tr. 237).

When L.W. was a year old, the Parents moved to Evansville, Indiana, an hour away from Grandparents' home in Madisonville, Kentucky.[1] Mother opened a new pediatric dentistry practice in Evansville and shortened her hours so that she worked only two to four days a week. Grandparents continued to care for L.W. during the days that

---

[1] It is not clear whether Grandparents lived in Madisonville, Kentucky when the Parents initially moved to Evansville. However, at some point they bought a home there and split their time between Madisonville and seeing Mother and L.W. in Evansville.

Mother was at work. When L.W. became old enough to attend pre-school, Grandparents would fix her breakfast, get her dressed, and take her to school. Throughout L.W.'s early childhood, Mother and Grandparents served as L.W.'s primary caretakers.

In late July 2010, when L.W. was five years old, Mother was diagnosed with stage four colon cancer. Mother asked Grandparents to move in with the Parents again to care for her and L.W., which Grandparents did. Typically, Grandmother would fix L.W.'s breakfast and get her ready for school; take L.W. to school and pick her up after school, sometimes with Mother, if Mother was feeling well; read to L.W. at night; do the family's laundry and chores; and cook for the family. Mother received multiple treatments from 2010 to 2013, some of which were out of town. Every time Mother went out of town for treatments, Grandparents and L.W. went with her. If L.W. missed school, her teachers would send her assignments, and Grandmother, a retired teacher, would ensure that she completed her homework.

In early 2013, Mother filed for a dissolution of marriage from Father. On March 1, 2013, the trial court held a provisional hearing to determine temporary custody arrangements. At the hearing, Mother testified that Father was an "absent" and "non[-]participatory" parent. (Tr. 16, 45). She claimed that, although this was partly due to his heavy work schedule, it was also due to his extracurricular activities, such as cycling, flying his airplane, going to the gym, and playing video games. She stated that Father's time with L.W. was "minimal" and that there were days when he never saw L.W. (Tr. 47).

4

Father testified and admitted that he was not always able to attend L.W.'s extracurricular activities as a result of work. He also mentioned that the marital situation between himself and Mother "ha[d] [not] been excellent for a long time" and that it was "always [his] feeling that having her parents living with [them] [was] not a positive situation." (Tr. 66). At the conclusion of the hearing, the trial court granted the Parents temporary, joint legal custody and Mother temporary, primary physical custody pending the resolution of the dissolution proceedings.

Shortly thereafter, Mother's health worsened, and she asked Grandparents to petition for grandparent visitation with L.W. if she died. She also included a provision in her will stating that:

> My estranged husband, [Father], is recognized by law as the natural guardian of our daughter, [L.W.]. As [Father] has had no significant relationship to date with our daughter, [L.W.], I would direct that my parents, [Grandparents], seek generous visitation rights with [L.W.], and that, in the event my estranged husband is deemed unfit, or fails to demonstrate a willingness to appropriately parent our child, [L.W.], or in the event that the appointment of a guardian for [L.W.] . . . becomes necessary or convenient, I nominate and appoint my parents, [Grandparents], or either of them individually, to serve as guardians.

(Father's Ex. 9 at 8).

On April 9, 2013, Mother's attorney, Keith Vonderahe ("Vonderahe"), contacted Father's attorney and told him that Grandparents planned to file a petition for visitation. Vonderahe also told Father that Grandparents would be willing to forego a legal petition if Father would agree to visitation without a court order. However, Father did not respond to the e-mail. Subsequently, Mother died on April 17, 2013, while the

5

dissolution proceedings were still pending. The day that she died, Grandparents filed a petition requesting grandparent visitation with L.W.[2]

A few days prior to Mother's death, Father contacted a mental health counselor named Laura Ellsworth ("Ellsworth") to help L.W. deal with her grief and transition to his custody. Based on Ellsworth's advice, Father arranged for L.W. to meet with another therapist, Lisa Provost ("Provost"), for counseling. L.W. met with Provost approximately every three to four weeks thereafter.

Father also asked Ellsworth to determine L.W.'s best interests in terms of grandparent visitation. Before the end of April, Ellsworth met with Father and L.W. two times in her office and once in their home. She also met with Grandparents once in her office. From the first time she saw L.W. and Father together, she observed that "[L.W.] like[d] to sit in her father's lap and poke on her father's face[,] and she like[d] to challenge him and tease him." (Tr. 145). Ellsworth thought their attachment "appeared strong from the very beginning." (Tr. 197-98). However, she also found that L.W. had a "strong bond" with Grandparents and felt that it was "important for them to continue to maintain a relationship." (Father's Ex. 3 at 2). She perceived that there was "some animosity from both sides" between Grandparents and Father because Father felt that Grandparents were not communicating with him and had withheld L.W. from him while Mother was sick, and because Grandparents were concerned that Father did not have a strong parental bond with L.W. (Tr. 133).

---

[2] Grandmother testified that they filed their petition the day that Mother died. However, it is apparent that they originally filed their petition under Mother's dissolution cause number and later filed the petition under this cause on May 16, 2013.

On April 30, 2013, Ellsworth recommended a temporary grandparent visitation schedule for Father and Grandparents to follow until L.W. returned to school the following Fall. The schedule provided for Grandparents to have visitation with L.W.: (1) on Tuesdays from 3:00 to 6:00 p.m. until the end of the school year; (2) one Saturday per month from 7:00 a.m. to 8:00 p.m.; and (3) for one five-day consecutive period during the summer. (App. 89). Ellsworth also encouraged Grandparents to attend L.W.'s swim meets and other spectator activities. She intended to treat the summer as an "evaluative" period so that she could further observe L.W.'s relationships with Father and Grandparents before issuing final recommendations to the trial court. (App. 89).

Father agreed to follow Ellsworth's recommendations and sent the proposed schedule to Grandparents' lawyer. In the months that followed, however, he did not allow Grandparents visitation on any of the Tuesdays before L.W.'s school year ended or on any Saturdays throughout the evaluative period. He did allow visitation for a five-day period in the summer, which, with Ellsworth's agreement, was divided into two visits because L.W. was suffering from separation anxiety at the thought of leaving Father for five days in a row. Father also took L.W. to meet Grandparents for lunch on Mother's Day, on a day in June, and on a day in September, and he allowed L.W. to spend one Sunday with Grandparents. Throughout the summer, Father allowed Grandparents to see L.W. at her sporting events, which Grandparents attended.

Because Grandparents attended L.W.'s sporting events, they got to know one of L.W.'s summer nannies, Jamie Riedford ("Riedford"). One day when Grandparents were attending L.W.'s swim practice, they asked if Riedford and L.W. would like to go to

7

lunch. Riedford called Father to ask permission. He gave his permission, so she and L.W. went to lunch with Grandparents. Later that night, Father asked Riedford to come over to his house, where he "asked [her] to keep [her] guard up and told [her] that [Grandparents] were [not] being nice to [her] for any reason other than to get to him and [in] effect, get information for [Grandparents'] court case." (Tr. 215). Riedford did not agree with Father, and he continued the conversation later that night for an hour over the phone. Father also had his lawyer write Grandparents' lawyer a letter asking them not to communicate with L.W. through any third parties. For the rest of the summer, Grandparents continued to speak with Riedford but did not communicate with her about L.W.

After Ellsworth provided her initial recommendations to Father and Grandparents, Father and L.W. continued to meet with her. They also met with Doctor Rebecca Luzio ("Dr. Luzio"), the expert that Grandparents hired for the visitation proceedings. Ellsworth had five home visits with Father and L.W. but did not meet with Grandparents and L.W. together. Dr. Luzio met with Father and Grandparents twice each; once with Grandparents and L.W.; twice with Father and L.W.; and once with L.W. by herself.

Ellsworth and Dr. Luzio "collaborated regularly" on their observations, and they conducted two joint sessions with Father and Grandparents. (Tr. 134). The joint sessions were intended to bring Father and Grandparents together so that they could find common ground and start discussing visitation. During the first joint session, Grandfather became "very upset and angry" with Father about Father's relationship with Mother and at one point "[came] up off the couch and started across the room towards [Father]." (Tr. 150).

8

Both Ellsworth and Dr. Luzio rose and stood between him and Father. Soon thereafter, Ellsworth and Dr. Luzio ended the session and asked Father and Grandparents to leave separately. The second joint session was also unsuccessful, although Grandfather did not approach Father again. Because both sessions had been unsuccessful, Ellsworth and Dr. Luzio did not schedule a third session. Dr. Luzio did, however, recommend follow-up grief and anger management counseling to Grandfather, which he completed.

On September 27, 2013 and October 25, 2013, the trial court held a hearing on Grandparents' petition for grandparent visitation. At the hearing, Ellsworth and Dr. Luzio submitted their recommendations for visitation, which they had developed based on their interactions with Father, L.W., and Grandparents over the summer. Both agreed that Father was a fit parent and that L.W. and Father had a strong relationship. Ellsworth noted that L.W. had become increasingly frustrated by Grandparents' contact with her over the summer. She stated that it appeared that L.W. was beginning to resent Father's ongoing encouragement that she contact Grandparents. As a result, Ellsworth recommended that Father be permitted the right to determine L.W.'s schedule of visitation with Grandparents. She concluded, "Based on the amount of contact [that] has occurred, and has been encouraged by [Father] over the summer, there [is not] a reason to believe he will not follow through on continuing to encourage this relationship." (Father's Ex. 5 at 5).

Dr. Luzio noted that Father "appear[ed] to have grown as [L.W.'s] father" and that L.W. "loves him very much." (Father's Ex. 8 at 4). However, she also stated that, because Grandparents had been "key members" of L.W.'s life, it was "disturbing" that

9

Father had only allowed them three overnight visits with L.W. and one visit at their home since Mother had died.[3]  (Father's Ex. 8 at 5).  She had "grave concern[s]" about Father's willingness to provide future grandparent visitation as he had allowed so little visitation during the period when he had been in control.  (Tr. 244).  She noted that on occasions Father had offered Grandparents visitation on the condition that they first had to answer a list of questions that were unrelated to L.W.  Then, Father would withdraw his offer to allow visitation if they did not respond to his questions the way he wanted.  As a result of all of these factors, Dr. Luzio recommended that the trial court impose a set schedule for Grandparent visitation, in spite of the fact that she considered Father a fit parent.

L.W.'s summer nanny, Riedford, also testified at the hearing.  She told the court that she had observed L.W.'s interactions with Grandparents at swim meets over the summer and had noticed that early in the summer L.W. was "very excited" to see Grandparents.  (Tr. 208).  She would "run up to them when they got there," be "very loving towards them," and "be upset when they [left]."  (Tr. 208).  Then, "towards the end [of the summer] it would be more like she did [not] even want to talk to them."  (Tr. 208).  According to Riedford, L.W. had told her that "her daddy did [not] like when she talked to her grandparents if he did [not] know about it" and that he thought it was "weird" for her to see her grandparents as much as she did.  (Tr. 212, 214).  Riedford also noticed that L.W. would get worked up and upset, believing that she would get in trouble if she was around Grandparents without Father.  (Tr. 212).  Finally, Riedford testified that Father had told her that he wanted to terminate L.W.'s relationship with Grandparents.

---

[3] As stated previously, Father actually allowed Grandparents five overnight visits.

10

She said that, on one occasion, he "listed off names of members of his family and [] said '[L.W.] has all of these people in her life[,] and what is minus two[?']" (Tr. 229).

When Grandmother testified, she stated that she thought that if they were going to have visitation with L.W., it would have to be court-ordered, because Father had not allowed them visitation in spite of Ellsworth's proposed schedule. She also mentioned that, although Father had allowed Grandparents to talk to L.W. on the phone throughout the summer, L.W. had always been on speakerphone, so they could not talk privately.

Grandfather discussed his reaction to Father in the joint session and stated that he "did not" and "will not" confront Father about anything around L.W. (Tr. 384). Grandparents' attorney asked him whether he would be able to visit L.W. without expressing his sentiments about Father, and he responded, "She'll never hear it from me." (Tr. 386).

When Father testified, he claimed that he had proposed Ellsworth's visitation schedule to Grandparents but had not followed it because Grandparents had never agreed to the arrangement. He argued that he had, nevertheless, allowed Grandparents significant contact with L.W. In support of this argument, he introduced a calendar documenting L.W.'s contact with Grandparents. According to the calendar, Father had allowed Grandparents contact with L.W. six out of twelve days after Mother's death in April; eleven days in May; eight days in June; eleven days in July; seven days in August; and four days in September. However, almost all of these contacts occurred when Grandparents attended L.W.'s sporting or school events. Father also testified about his concerns with taking L.W. to visit Grandparents and stated "I don't take my child to play

11

with people that don't like me," although he later admitted that L.W. needed to grieve, and she needed to spend time with her grandparents to do so. (Tr. 336).

At the conclusion of the hearing, the trial court took the matter under advisement. On January 22, 2014, it entered an order granting Grandparents' petition. In its order, the trial court recognized that Father was a fit parent but concluded it was in L.W.'s best interests to continue her relationship with Grandparents, and Father had made "clear statements regarding his intention and desire to remove the Grandparents from [L.W.'s] life." (App. 20). As a result of Father's stated intention to remove Grandparents from L.W.'s life and his admission that he had not abided by Ellsworth's recommended visitation schedule,[4] the trial court determined that Grandparents had rebutted the presumption that Father's decisions about grandparent visitation were in L.W.'s best interests. The court ordered that Grandparents receive structured and unsupervised visitation: (1) one overnight on one weekend during even-numbered months; (2) two overnights on one weekend during odd-numbered months; (3) every Tuesday during the school year until 7:00 p.m. and during the summer from 10:00 a.m. to 7:00 p.m.; (4) eight hours on Mother's birthday; (5) four hours on Grandparents' birthdays; (6) one overnight during the week of L.W.'s birthday; and (6) five consecutive days during the summer. Father now appeals.

---

[4] The trial court did not find Father's argument that Grandparents had not agreed to the proposed visitation schedule credible as it contradicted an e-mail Father sent Ellsworth in which he indicated that he had agreed to follow her recommendations during the summer months.

DECISION

Grandparents are "'members of the extended family whom society recognizes as playing an important role in the lives of their grandchildren.'" *Swartz v. Swartz*, 720 N.E.2d 1219, 1221 (Ind. Ct. App. 1999) (quoting *Sightes v. Barker*, 684 N.E.2d 224, 230 (Ind. Ct. App. 1997), *trans. denied*). By enacting the Grandparent Visitation Act, our General Assembly recognized that "a child's best interest is often served by developing and maintaining contact with his or her grandparents." *McCune v. Frey*, 783 N.E.2d 752, 755 (Ind. Ct. App. 2003) (quoting *Swartz*, 720 N.E.2d at 1221). However, grandparents "'do not have the legal rights or obligations of parents,' and 'do not possess a constitutional liberty interest in visitation with their grandchildren.'" *Id.* (quoting *Swartz*, 720 N.E.2d at 1222). Therefore, the Grandparent Visitation Act balances two competing interests: the rights of parents to raise their children as they see fit and the rights of grandparents to participate in the lives of their grandchildren. *Swartz*, 720 N.E.2d at 1222.

Under the Grandparent Visitation Act, a grandparent may seek visitation if the child's parent is deceased. IND. CODE § 31-17-5-1. The trial court may grant visitation if it determines that visitation rights are in the best interests of the child. I.C. § 31-17-5-2. When making this determination, the trial court is to "'presume that a fit parent's decision is in the best interests of the child,'" although that presumption is rebuttable. *Megyese v. Woods*, 808 N.E.2d 1208, 1213 (Ind. Ct. App. 2004) (quoting *Crafton v. Gibson*, 752 N.E.2d 78, 96 (Ind. Ct. App. 2001)). The trial court must also give "special weight" to a parent's decision to deny or limit visitation and "some weight" to the fact

13

that a parent has agreed to some visitation. *Id.* In total, there are four factors that a trial court must address when ruling on a petition for grandparent visitation: (1) the presumption that a fit parent acts in his or her child's best interests; (2) the special weight that must be given to a fit parent's decision to deny or limit visitation; (3) whether the parent has denied visitation or simply limited visitation; and (4) whether the grandparent has established that visitation is in the child's best interests. *In re K.I.*, 903 N.E.2d 453, 462 (Ind. 2009). The trial court may also consider whether grandparents have had or have attempted meaningful contact with the child. *Ramsey v. Ramsey*, 863 N.E.2d 1232, 1238 (Ind. Ct. App. 2007). If a trial court allows visitation, that visitation must be only "occasional, temporary" visitation that does not infringe on a parent's fundamental rights. *K.I.*, 903 N.E.2d at 462.

When a trial court issues an order on a petition for grandparent visitation, it must include written findings and conclusions. I.C. § 31-17-5-6. Thus, on review of a trial court's order granting grandparent visitation, we apply the Indiana Trial Rule 52 standard, which provides that we may not set aside the trial court's findings or judgment unless they are clearly erroneous. *Megyese*, 808 N.E.2d at 1213. First, we determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence to support the findings or the findings fail to support the judgment. *Id.* We do not reweigh the evidence or determine witness credibility. *Id.* Rather, we consider only the evidence most favorable to the trial court's judgment, with all reasonable inferences drawn in favor of the judgment. *Id.*

14

On appeal, Father argues that the trial court erred by granting Grandparents' petition for visitation. Alternately, he asserts that even if the trial court did not err in granting visitation, it abused its discretion in determining the amount of visitation. He contends that the amount of visitation the trial court awarded exceeds the "occasional, temporary" visitation contemplated by the Grandparent Visitation Act. *See K.I.*, 903 N.E.2d at 462.

1. Grant of Visitation

First, we will address Father's argument that the trial court erred in granting visitation. He disputes three of the four factors that the trial court was required to address in its order. He admits that the trial court acknowledged he is a fit parent and, therefore, enjoys a presumption that his decisions regarding visitation are in L.W.'s best interests. However, he argues that the trial court (1) failed to give special weight to his decisions regarding visitation; (2) erred in assessing the amount of visitation he had allowed and would continue to allow Grandparents; and (3) erred in determining that Grandparents had rebutted the presumption that his decisions concerning visitation were in L.W.'s best interests. We will address each factor in turn.

A. *Special Weight*

Under the Grandparent Visitation Act, the trial court must give special weight to a fit parent's decision to allow or deny grandparent visitation. *Megyese*, 808 N.E.2d at 1213. Here, the trial court stated in its conclusions that it gave Father's decisions concerning visitation special weight. However, the trial court also made two findings that Father claims are inconsistent with this conclusion and show that the trial court did

15

not actually afford his decision any special weight. Specifically, the trial court found that:

> At the hearings, the Father did not articulate any specific evidence which supported his claim that his parental relationship with [L.W.] was undermined by the Grandparents other than his belief that prior to the Mother's death, they assisted the Mother in his not seeing [L.W.]. Since the death of the Mother, Father cited no specific evidence of "undermining" by the Grandparents other than overindulging [L.W.] in "sweets."

(App. 18). The trial court also found that:

> Although the Grandfather demonstrated some anger and frustration at the Father during a joint counseling session where he stood up and told the Father that he was "not a man," the Grandfather has completed the three grief counseling sessions recommended by Dr. Luzio and cannot seriously be considered a threat to [L.W.]. [L.W.] was not present during the incident, and there is no evidence that either Grandparent has ever been anything but loving and appropriate while [L.W.] is nearby.

(App. 22). Father claims that the evidence does not support these findings. He also claims that these findings do not support the trial court's conclusion that it gave his decision to limit Grandparents' visitation special weight because they, instead, indicate that the trial court ignored Father's reasons for limiting Grandparents' visitation.

At the hearing, Father testified that he had two concerns justifying his reluctance to allow Grandparents visitation—his concern that Grandparents had undermined and were continuing to undermine his relationship with L.W. and his concern that it was not in L.W.'s best interests to expose her to Grandparents' hostility towards him. Essentially, Father argues that if the trial court had granted his decision to limit Grandparents' visitation special weight, it would not have discounted these concerns in its findings. On review, we will first consider whether the evidence supports these findings and, then,

16

whether the trial court's findings support its conclusion that it gave Father's decision regarding visitation special weight.

With regard to his concern that Grandparents had undermined him, Father argues that the trial court's finding is erroneous because he presented evidence at the hearing that Grandparents had undermined him by arranging to see L.W. through her nanny, Riedford, even after he requested that they make such arrangements only through him. He also claims that the finding fails to consider his allegation that the Grandparents misled Riedford into believing that he wished to terminate their relationship with L.W.

Contrary to Father's contentions, the issue of whether Grandparents intended to undermine Father by making arrangements through Riedford was disputed at trial. Riedford testified that Grandparents merely talked to her when they were attending L.W.'s swim meets, which they had attended for L.W.'s entire life and which were a component of Ellsworth's recommended visitation schedule. Grandparents went to lunch with Riedford and L.W.—with Father's permission—on one occasion when they also planned to attend L.W.'s swim practice, but there is no other evidence that they otherwise arranged to visit with L.W. without Father's knowledge. Riedford also testified that after Father told Grandparents not to communicate through a third party, Grandparents abided by his request and did not communicate with her concerning L.W.

Likewise, Father's allegation that Grandparents misled Riedford by telling her that Father was trying to terminate their relationship with L.W. was also disputed at trial. Riedford testified that it was Father, not Grandparents, who told her that he wished to terminate Grandparents' relationship with L.W.

17

Although the trial court did not make a finding explicitly addressing Father's contention that Grandparents had undermined him through their interactions with Riedford, the trial court heard Father's evidence and by implication did not find that evidence persuasive. Therefore, in light of the evidence supporting the trial court's finding that Grandparents had not undermined Father, we conclude that the trial court's finding was not erroneous. It is not our place to reweigh the evidence on appeal. *Megyese*, 808 N.E.2d at 1213.

With regards to Father's second concern, that it was not in L.W.'s best interests to expose her to Grandparents' hostility towards him, he argues that the trial court did not sufficiently address Grandparents' anger towards him in its findings of fact and conclusions of law. However, the only evidence Father raises that the trial court did not cite is that when Grandparents and L.W. met with Dr. Luzio on July 13, 2013, L.W. expressed her preference to see Grandparents less frequently and for brief periods of time. He claims that this evidence demonstrated that L.W. was aware of Grandparents' hostility towards him. This is merely an invitation to reweigh the evidence, as there is also evidence in the record that L.W.'s request related to her desire to stay in Evansville for her extracurricular activities. As we have stated, we may not reweigh the evidence on appeal. *Megyese*, 808 N.E.2d at 1213. Because Father does not otherwise cite any evidence of Grandparents' anger that the trial court should have cited that it did not, we will not address this issue further.

Turning to whether the trial court's findings supported its conclusion that it gave Father's decision regarding Grandparents' visitation special weight, we reiterate that,

18

essentially, Father argues that if the trial court had granted his decisions special weight, it would not have discounted his concerns in its findings. He does not cite any legal support for his argument that his concern that Grandparents would undermine him was a justifiable reason for limiting visitation, but he claims his concern regarding Grandparents' anger towards him was justified based on our conclusion in *Visitation of C.L.H.*, 908 N.E.2d 320 (Ind. Ct. App. 2009), where we held that C.L.H.'s mother was justified in denying visitation to her parents as a result of the hostility between her and her parents.

In making this argument, Father misconstrues the "special weight" requirement. We have previously explained that "the requirement that the trial court afford the parent's decision special weight deals with the trial court's process of weighing the evidence." *Ramsey*, 863 N.E.2d at 1239. It "'does not require a trial court to take at face value any explanation given by a parent,'" and the trial court is not required to accept a parent's reasons as true. *Hicks v. Larson*, 884 N.E.2d 869, 875 (Ind. Ct. App. 2008) (quoting *Spaulding v. Williams*, 793 N.E.2d 252, 260 (Ind. Ct. App. 2003)), *trans. denied.* "'It is the trial court's prerogative to listen to the evidence and determine, in light of that evidence, whether a parent's alleged justification for denying or restricting visitation with grandparents holds water.'" *Id.* (quoting *Spaulding*, 793 N.E.2d at 260). Therefore, as long as a trial court affords a parent's decision regarding visitation special weight, the trial court may still find that a parent's reasons for denying visitation are not credible or that other factors in the record outweigh the parent's decision. *See id.*

19

Because a trial court is not required to agree with a parent's reasons for his or her decision concerning visitation in order to grant that decision special weight, we disagree with Father's contention that the trial court's findings were inconsistent with its conclusion that it granted his decision special weight. *See id.* It is clear that the trial court here considered Father's concerns, even if it did not ultimately find in Father's favor. As the special weight requirement does not require the trial court to apply the same weight to Father's concerns as he does, we will not reweigh the evidence. *See Hicks*, 884 N.E.2d at 875 (holding that the special weight requirement does not require the trial court to accept a parent's reasons for denying visitation as true); *Megyese*, 808 N.E.2d at 1213 (stating that we may not reweigh the evidence on appeal). Accordingly, we determine that the trial court did not err in concluding that it had granted Father's decisions concerning visitation special weight.

B. *Denial of Visitation*

The next factor a trial court must address in its findings and conclusions concerning grandparent visitation is whether the parent has denied visitation or simply limited visitation. *Megyese*, 808 N.E.2d at 1213. Here, the trial court made multiple findings and conclusions on this point.

On the subject of Father's past history of visitation, the trial court found that "[a]lthough the Grandparents watched [L.W.'s] extracurricular events, Father generally did not allow any Tuesday or Saturday visits. Any telephone communications between [L.W.] and her Grandparents were always conducted on a speaker phone with the Father present." (App. 15). The trial court also found:

20

Father testified he did not follow his own expert's visitation recommendations because 'there was never an agreement' between himself and the Grandparents to follow such a schedule. This testimony contradicted Father's email to Ms. Ellsworth where he indicated he agreed to follow her recommendations during "the summer months." (See 8/30/13 email in Dr. Luzio's records).[5] In reality, Father only followed Ms. Ellsworth's recommendations that the Grandparents be allowed to attend [L.W.'s] sporting events as spectators, an activity the Grandparents had always done, and the three (3) days and (2) day overnight visits.

(App. 16).

The trial court then concluded:

although the Father has allowed some contact between the Grandparents and [L.W.,] . . . he has made clear statements regarding his intention and desire to remove the Grandparents from [L.W.'s] life. Based on these stated intentions, as well as Father's own admission that he did not abide by the visitation schedule recommended by his own expert, the Court finds and concludes as a matter of law that had this proceeding not been pending, it is likely that the Father would have denied all visitation between the Grandparents and [L.W.]. The relationship between [L.W.] and her Grandparents has shown strain over the summer as [L.W.] distanced herself from them, perhaps in an attempt to please her Father.

(App. 20-21).

Father claims that the trial court's finding that he did not follow Ellsworth's visitation schedule was erroneous and that the trial court erred in concluding that he would deny visitation in the future absent a court order. He also argues that the trial court should have granted weight to the fact that he limited, rather than denied, Grandparents' visitation. We will address each of these arguments in turn.

First, Father asserts that the trial court's finding that he did not follow his expert's recommendations was erroneous. He specifies that the recommendations were only

---

[5] Notably, Father also wrote on his submitted calendar exhibit that Grandmother had agreed to the proposed schedule in June.

21

supposed to last through the summer and that the Tuesday afterschool visits were only intended to last through the end of the school year. He claims that throughout the summer he ensured that Grandparents had consistent and regular contact with L.W. because he arranged a day-long visit on a Sunday in June, gave them five full days of visitation in July, arranged to take L.W. on visits to Madisonville, and allowed Grandparents to frequently telephone L.W.

However, Father's arguments do not demonstrate any error in the trial court's findings. The trial court did not find that Father denied Grandparents visits on Tuesdays during the summer after school ended, as Father implies, and the trial court did not indicate that it considered visitation during a time period other than that covered by the initial recommendations. Also, the trial court acknowledged that Grandparents had consistent contact with L.W. The court merely found that Father did not follow Ellsworth's proposed schedule, which Father cannot contradict, as he does not allege that he actually allowed Grandparents visitation on Tuesdays before school ended or on one Saturday per month. He contends that he arranged a full day visit with Grandparents on a Sunday rather than a Saturday in June, but he does not account for his denial of weekend visitation during the remaining months—May, July, or August. Likewise, his argument that he arranged to take L.W. to Madisonville did not fulfill this visitation recommendation. Based on the calendar he provided, he stopped in Madisonville for an hour lunch with Grandparents on two different occasions when he and L.W. were on their way to various events and took L.W. to meet Grandmother for a two-hour lunch on Mother's Day. These four hours spent eating lunches are not equivalent to three full,

unsupervised days of visitation. Accordingly, we conclude that sufficient evidence supports the trial court's finding that Father did not comply with Ellsworth's recommendations.

Next, Father argues that the trial court's conclusion that he would deny Grandparents visitation absent a court order was not supported by the evidence and findings. In support of this contention, he raises challenges to the evidence that we have already addressed, such as his argument that Grandparents misled Riedford into believing that he planned to terminate Grandparents' relationship with L.W. He also claims that the evidence that he "listed off names of members of his family and [] said '[L.W.] has all of these people in her life[,] and what is minus two[?']" was taken out of context. (Tr. 229). However, as we stated previously, Riedford specifically testified that Father told her he intended to terminate Grandparents' relationship with L.W. It is not our place to reweigh evidence or witness credibility on appeal. *Megyese*, 808 N.E.2d at 1213. Accordingly, we conclude that the trial court's finding that Father would deny Grandparents visitation absent a court order was not erroneous.

Finally, Father argues that the trial court should have granted weight to the fact that in the past he limited, rather than denied visitation. In grandparent visitation cases, the trial court must give "some weight" to the fact that a parent has allowed some visitation. *Id.* (quoting *Crafton*, 752 N.E.2d at 96). In *Visitation of M.L.B.*, 983 N.E.2d 583, 587 (Ind. 2013), our Supreme Court explained that whether visitation has been denied or limited "defines what interest of the child's is at stake." Specifically:

23

> If visitation has been denied unreasonably, then the stakes are whether the child will have *any* relationship with the grandparents, which may strengthen the case for judicial intervention. But when a parent has already offered visitation voluntarily, albeit within reasonable limits, it is not the existence of a relationship at stake, but only *on whose terms* it will be. In that event, a grandparent-visitation order particularly implicates the danger of infring[ing] on the fundamental right of the parents to make child rearing decisions simply because [a court] believes a 'better' decision could be made.

*Id.* (emphasis in original) (internal citations and quotation marks omitted).

Significantly, we note that the trial court never found that Father had previously denied visitation completely. The trial court specifically acknowledged that Father had allowed visitation, even if that visitation did not comply with Ellsworth's recommendations. Therefore, we cannot conclude that the trial court did not give some weight to the fact that Father had allowed visitation.

Regardless, our Supreme Court stated in *Visitation of M.L.B.* that the purpose of giving some weight to the fact that a parent has allowed some visitation is to recognize that there may be less need for judicial intervention because the existence of a relationship between the grandparents and the child is not at stake. *Id.* Here, the trial court expressly concluded that the existence of a relationship between Grandparents and L.W. was at stake because the evidence presented demonstrated that, without a court order, Father would likely deny Grandparents visitation. Therefore, we cannot agree with Father's argument that the trial court did not afford appropriate weight to the fact that he had allowed some visitation in the past.

C. *Rebuttal of Presumption*

24

Next, Father challenges the final factor a trial court must consider in granting visitation—whether Grandparents have shown that visitation is in the child's best interests. He acknowledges that it is in L.W.'s best interests to have a relationship with Grandparents but argues that they did not rebut the presumption that, as a fit parent, his decisions regarding visitation are in L.W.'s best interests and that he, therefore, should be able to determine when that visitation occurs. He does not raise any specific arguments in support of this contention other than the arguments he has previously raised. Nevertheless, he asserts that the trial court's conclusion is not supported by the evidence before the trial court and its findings.

Because it is undisputed that a relationship with Grandparents is in L.W.'s best interests, we will not address that factor, but will instead address whether Grandparents rebutted the presumption that Father's decisions concerning grandparent visitation were in L.W.'s best interests, to the extent that he should be able to determine when that visitation occurs. In *Spaulding*, we considered a case analogous to the instant case. *Spaulding*, 793 N.E.2d at 261. There, the grandparents had been an important part of the child's daily life prior to the child's mother's death. *Id.* After the mother's death, the father decided to terminate the grandparent's relationship with the child, and the trial court found that termination of the relationship was not in the child's best interests. *Id.* Accordingly, the trial court held that the grandparents had rebutted the presumption that the father's decisions regarding visitation were in the child's best interests. *Id.*

Likewise, here, it is undisputed that a relationship with Grandparents is in L.W.'s best interests, and the trial court concluded "as a matter of law that absent a Court order,

25

the Father [would] not consistently allow for such regular and meaningful contact." (App. 22). For this reason, the court determined that Grandparents had rebutted the presumption. As we have already found that there is evidence to support the trial court's conclusion that Father would not consistently allow Grandparents contact with L.W. without a court order, and it is undisputed that such contact is in L.W.'s best interests, we conclude that the trial court did not err in determining that Grandparents had rebutted the presumption that Father's decisions regarding visitation were in L.W.'s best interests. As in *Spaulding*, there was evidence to support the trial court's conclusion that Father's intention to deny L.W. a relationship with her grandparents was not in her best interests.

## 2. Amount of Visitation

Finally, Father argues that the trial court abused its discretion in the amount of grandparent visitation it ordered. Our Supreme Court has previously held that "'although the amount of visitation is left to the sound discretion of the trial court, the Grandparent Visitation Act contemplates only occasional, temporary visitation that does not substantially infringe on a parent's fundamental right to control the upbringing, education, and religious training of [his or her] children.'" *Visitation of M.L.B.*, 983 N.E.2d at 586 (quoting *K.I.*, 903 N.E.2d at 462). Father contends that the amount of visitation the trial court ordered exceeds "occasional, temporary visitation." *Id.*

Indiana courts have not established a set standard for "occasional, temporary visitation," and, as stated above, a trial court has discretion in establishing an appropriate amount of visitation. *Id.* However, our past decisions provide us with some guidance. As a general rule, we have previously held that it is *prima facie* error to grant a

26

grandparent visitation rights nearly equivalent to those of a non-custodial parent. *Hoeing v. Williams*, 880 N.E.2d 1217, 1221 (Ind. Ct. App. 2008). In *Swartz*, we held that the trial court had abused its discretion when it ordered visitation on alternating weekends where the child would be alternating between four different households and would live outside of Mother's home seventy-three days per year. 720 N.E.2d at 1222. We noted that the schedule was akin to one devised for a non-custodial parent and that the grandparents had "essentially been given the visitation rights of [a] parent in lieu of [the child's father], with no corresponding duties." *Id.* at 1222, 1223. In *Hoeing*, we likewise found that visitation of ninety-six days per year was excessive. *Hoeing*, N.E.2d at 1222.

Grandparents direct us to *Wilson v. Cloum*, 797 N.E.2d 288 (Ind. Ct. App. 2003), *reh'g denied*, *trans. denied*, where we upheld a trial court's grant of grandparent visitation, which was phased down to one weekend per month, holidays, and summer vacations, after a transition period. However, on appeal, the parents did not challenge the amount of visitation the trial court granted, so we did not address the issue. *See id.* Alternately, Grandparents cite *In re Marriage of Weddel*, 553 N.E.2d 213, 214 (Ind. Ct. App. 1990), *reh'g denied*, where we held that it was not an abuse of discretion for a trial court to award grandparent visitation one weekend a month, one Saturday on an alternative weekend, six weeks during the summer, every other holiday, special occasions, one week at Easter, and one additional day per month. We do not find this case persuasive, either, though, because it preceded our determinations that the Grandparent Visitation Act only contemplates "occasional, temporary visitation" and that an award akin to parenting time is an abuse of discretion. *See Sightes*, 684 N.E.2d at 230

27

(stating that the Grandparent Visitation Act only contemplates "occasional, temporary visitation"); *Swartz*, 720 N.E.2d at 1222, 1223 (finding an abuse of discretion where grandparent visitation was akin to that awarded to a non-custodial parent).

In this case, the trial court ordered that Grandparents receive structured and unsupervised visitation: (1) one overnight on one weekend during even-numbered months; (2) two overnights on one weekend during odd-numbered months; (3) every Tuesday during the school year until 7:00 p.m. and during the summer from 10:00 a.m. to 7:00 p.m.; (4) eight hours on Mother's birthday; (5) four hours on Grandparents' birthdays; (6) one overnight the week of L.W.'s birthday; and (6) five consecutive days during the summer. This amount totals approximately seventy-nine days per year, which is higher than the amount we found was an abuse of discretion in *Swartz*. *See Swartz*, 720 N.E.2d at 1222. It is also very similar to the parenting time schedule a non-custodial parent would have. *See* Indiana Parenting Time Guidelines, § II (D) (recommending parenting time of alternating weekends, one evening per week, on scheduled holidays, and for half of summer break for children ages five and older).[6] Accordingly, we conclude that the trial court abused its discretion in its determination of the amount of visitation Grandparents would receive. We remand for the trial court to establish a visitation schedule that allows Grandparents "occasional, temporary visitation that does not substantially infringe on" Father's right to control L.W.'s "upbringing, education, and

---

[6] Grandparents argue that a non-custodial parent must receive ninety-eight overnights under the Parenting Time Guidelines, but as we stated above, we previously held in *Swartz* that an award of seventy-three overnights is close enough to an award for a non-custodial parent to constitute an abuse of discretion. *Swartz*, 720 N.E.2d at 1222.

religious training." *Visitation of M.L.B.*, 983 N.E.2d at 586 (quoting *K.I.*, 903 N.E.2d at 462).

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and BAILEY, J., concur.